407 So.2d 1375 (1981)
Lyle WOODS, et al., Plaintiffs-Appellees,
v.
James E. RATLIFF, et al., Defendants-Appellants.
No. 8517.
Court of Appeal of Louisiana, Third Circuit.
December 16, 1981.
*1376 Sholars, Gunby, Allbritton & Hayden, Clifford L. Lawrence, Jr., Monroe, for defendants-appellants.
Gaharan & Wilson, Joseph Wilson, Jena, for plaintiffs-appellees.
Before FORET, SWIFT and LABORDE, JJ.
LABORDE, Judge.
Plaintiffs filed suit against defendants seeking cancellation of a mineral lease, attorney's fees, and proceeds from oil sales allegedly due them. Defendants reconvened for the amount of its movable equipment allegedly appropriated by plaintiffs or alternatively, for rent of that equipment. Defendants also sought production payments, damages and attorney's fees. The trial court rendered judgment ordering cancellation of the mineral lease and awarding plaintiffs $2,288.98 in proceeds from oil sales and $7,500.00 in attorney's fees. Defendants were awarded $3,500.00 for plaintiffs' use of their movable equipment. Defendants appeal and raise the following issues:
1. Whether the mineral lease should have been ordered cancelled?
2. Whether plaintiffs were entitled to attorney's fees and if so was the amount awarded excessive?
3. Whether the damages awarded defendants on its reconventional demand should be increased?
4. Who owns the movable equipment located on the leased premises?
Following a recitation of the facts, each issue will be discussed separately.

FACTS
On December 18, 1973, George H. Woods, his wife Laurel, and their two sons Lyle and Donald, as record owners, executed an oil, gas and mineral lease covering property in LaSalle Parish, Louisiana. By a series of assignments and subleases, the leasehold "working interest" was acquired by the defendants Tennessee Fuel Sales, Inc., Harry C. Powell, J. T. Blong, and James E. Ratliff. Ratliff conducted business under the trade name "Jena Oil Company" which was designated as operator of the Woods No. 1 Well in July of 1976.
The Woods No. 1 Well is the only producing well on the leased premises and is the subject of this lawsuit.
*1377 Jena Oil Company operated the well, occasionally shutting it down for repairs or for other reasons but always resuming operations until May 2, 1979, when the high speed gear in the pumping unit broke. The broken gear was removed and a new one ordered to replace it with delivery expected by mid-June. Delivery of the new gear was delayed and no further operations were conducted by Jena Oil Company after May 2, 1979.
On August 2, 1979, Laurel, Lyle and Donald Woods, as record owners, granted an oil, gas and mineral lease covering the same property to RLS Partnership. On September 2, 1979, RLS Partnership commenced operations using Jena Oil Company's movable equipment except for the pumping unit which it installed.
In January of 1980, Laurel, Lyle, and Donald Woods and RLS Partnership instituted this suit against Tennessee Fuel Services, Inc., Harry C. Powell, J. T. Blong, and James E. Ratliff.

CANCELLATION OF THE MINERAL LEASE
In seeking a cancellation of the December 18, 1973, lease ultimately acquired by defendants, plaintiffs allege that the lease expired due to defendants' failure to produce the well or to conduct additional drilling or reworking operations without cessation in operations of more than ninety consecutive days as provided by the lease.
It is defendants' position that the lease was maintained by both production and operations until May 2, 1979. Beyond that date, defendants contend that their obligations as lessees were suspended under the force majeure provisions of the lease. Finally, defendants contend that in any event, plaintiffs' suit should have been dismissed because the law requires a putting in default prior to filing a suit for cancellation of a mineral lease.
Section 2 of the lease in question sets forth its term. More particularly it provides:
"2. Subject to the other provisions herein contained, this lease shall be for a period of Ninety Days from this date (called `primary term') and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided."
Section 7 of the same lease, in pertinent part, provides:
"... If at the expiration of the primary term or at the expiration of the ninety day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith but Lessee is then engaged in drilling operations or reworking operations thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith...."
In accordance with these provisions then, the primary term of the lease extended ninety days from December 18, 1973, and if minerals were being produced at the end of the ninety day period, the primary term was extended and continued until production ceased. At the expiration of the primary term, however, the lease remains in force only if the lessee is producing minerals or is engaged in drilling or reworking operations with no cessation in these operations of more than ninety consecutive days.
Returning to the facts, plaintiffs established that the lease's primary term had expired due to the cessation of production caused by breakdowns following the initial ninety day period. Thereafter, the lease *1378 remained in force only by production of minerals or by drilling or reworking operations conducted with no cessation in operations of more than ninety consecutive days. In this regard, plaintiffs established that on May 2, 1979, the well was shut down and in excess of ninety consecutive days thereafter, defendants neither produced minerals nor drilled or reworked the well. The evidence compels the conclusion that by its terms, the lease terminated ninety days after May 2, 1979, unless, as defendants argue, it was suspended under its force majeure provisions. We now turn to a discussion of this possibility.
The force majeure provisions appear in Section 14 of the lease which, in pertinent part, provides:
"When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, ... or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, ... but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, ... or other minerals from the premises; ..."
The trial court was not impressed, from the evidence, that defendants were prevented from producing the well by either force majeure or by any cause beyond their control. We take the liberty of quoting portions of the trial court's written reasons concerning this issue:
"It is Ratliff's testimony (supported by both Little and McCartney) that as soon as the broken high speed gear was discovered a replacement part was ordered from Superior Iron Works. The initial anticipated delivery date of the replacement part was approximately 5-6 weeks after the date on which the defective part was discovered. However, Ratliff was unable to obtain the part until sometime in the fall of 1979, after the date on which the new lease had been granted in favor of RLS Partnership and operations had been commenced by that lessee. The question is simply whether or not the inability to obtain this part was something beyond the control of the lessee as contemplated by Paragraph 14 of the Woods/Vista Corporation lease.
In Logan v. Blaxton, 71 So.2d 675 (La. App.2d Cir. 1954), the defendant/lessee sought to excuse lack of performance under the `force majeure' provision of his lease. The defendant contended that the only feasible manner of transporting and marketing the oil was by truck but that he was prevented from delivering same as a result of impassable roads due to excessive rain. In rejecting his argument, the court stated:
`We are not of the opinion, from the evidence, that defendant established due diligence in his attempt to dispose of the production, and while it would appear from the evidence that it was not economical to connect this well with any of the pipelines in the vicinity, it appears that the defendant made only one effort to procure transportation for the oil and as to that the testimony of the defendant and his father is at considerable variance. The testimony does not establish the transportation in small trucks or by some other means of conveyance could not have been profitably effected.'

Logan v. Blaxton, supra at page 677.
It is apparent, from the evidence, that there were other means of restoring operation of the "Woods No. 1" well. According to the testimony of Monte Atkins, the field supervisor of RLS Partnership, there are machine shops in both Winnfield, Louisiana and Tullos, Louisiana which can effect repairs to the high speed gear. While these repairs are often temporary in nature, they are sufficient to *1379 enable restoration of operations until such time as a new part can be obtained. In his testimony, Ratliff stated that he had knowledge of such machine shops but simply elected not to employ temporary repairs.
Monte Atkins further testified that there are larger machine shops in Texas which have the ability to construct a new gear (by using the old gear as a pattern) and that delivery time from these sources is generally less than six weeks and the cost is comparable if not lower than the price charged by the manufacturer. Again, Ratliff acknowledged that he was aware of the existence of such companies.
It is clear from the testimony that Ratliff simply did not explore any of the options available to him, other than submitting the order for the new part through Superior Iron Works. It is also clear that the wells were put back into production by replacement of the pumping units. Ratliff, et al could have done the same. The situation is virtually identical to that set forth in Logan v. Blaxton, supra, in which the court held that the force majeure provision was inapplicable.
* * * * * *
It is my opinion that "force majeure" is inapplicable to the present case, because the situation is not one truly beyond the control of the lessee. There were at least two other sources from whom Ratliff could have obtained a temporary replacement part which would have restored operations within the required 90 days...."
Based on our thorough review of the record, we cannot say that the trial court committed manifest error in reaching this conclusion and on appeal, it must be affirmed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Finally, under this specification of error, defendants contend that the provisions of the Louisiana Civil Code concerning putting in default apply to mineral leases; that plaintiffs failed to put them in default and hence, that plaintiffs' suit must be dismissed.
While it is true that the codal articles on putting in default apply to mineral leases, LSA-R.S. 31:135, it is also true that when the term of a mineral lease runs, the lessor need not place the lessee in default as a prerequisite to a suit seeking a declaration that the lease has been dissolved by that fact. LSA-R.S. 31:133 and the comment under that article. In Talley v. Lawhon, 150 La. 25, 90 So. 427 (1922), the lessor sought cancellation of a mineral lease on the grounds that the lessee suffered more than 60 days to elapse between the cessation of work on one well and the beginning of work on another. The court, in response to the lessee's argument that a putting in default was required, stated:
"... We do not think so. There was nothing the said company could have been put in default about, as there was no obligation on its part to do anything. There was only a right on its part to prolong the existence of the lease by doing a certain specified thing within a certain specified time, or to let the lease run out by not doing that thing."

Talley v. Lawhon, supra 90 So. at page 428
An identical situation is presented in the present case. Defendants had the right but not the duty to maintain their lease by operations or production without a cessation of more than ninety consecutive days. Hence, there is nothing the defendants could have been put in default about.
Defendants' first specification of error lacks merit.

AWARD OF ATTORNEY'S FEES
Defendants contend the trial court erred in granting attorneys' fees to plaintiffs and alternatively, that the amount awarded was excessive.
LSA-R.S. 31:206 and 207 provide:
*1380 "§ 206. Obligation of owner of expired mineral right to furnish recordable act evidencing extinction or expiration of right
When a mineral right is extinguished by the accrual of liberative prescription, expiration of its term, or otherwise, the former owner shall, within thirty days after written demand by the person in whose favor the right has been extinguished or terminated, furnish him with a recordable act evidencing the extinction or expiration of the right.
§ 207. Effect of failure to furnish act evidencing extinction or expiration of right
If the former owner of the extinguished or expired mineral right fails to furnish the required act within thirty days of receipt of the demand, he is liable to the person in whose favor the right has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit."
The record establishes that the mineral lease in question expired by its own terms ninety days after May 2, 1979. Plaintiff at no time after this date made written demand on defendants.[1] Therefore, the trial court erred in awarding plaintiffs attorney's fee and that award is reversed on appeal.

THE RECONVENTIONAL DEMAND
RLS Partnership, in obtaining production from the Woods No. 1 Well, used some of defendants' movable equipment. Defendants, when sued, reconvened for the value of this equipment and alternatively for a rental fee for its use. The trial court awarded defendants' $3,500 for the use of that equipment. In its third assignment of error, defendants question whether these damages should be increased. Defendants also, through their fourth assignment of error, ask this court to recognize them as owners of the movable equipment. These two assignments will be discussed together.
As regards the matter of who owns the movable equipment located on the leased premises when RLS Partnership commenced operations, plaintiffs make no ownership claims to it and we hold that it is owned by defendants.
The question of damages for its use presents a more difficult one. The trial court, in arriving at this award, stated:
"In presenting evidence to support the reconventional demand, Ratliff, et al introduced no evidence or proof of the value of their demand in reconvention. They failed to establish the present value of the equipment and did not offer any testimony as to a fair rental value of the equipment. Under the circumstances, I am of the view that an award of $3,500.00 will fairly compensate defendant for the equipment used by RLS Partnership."
Several witnesses, some of them plaintiffs', testified regarding the value of the movable equipment located on the leased premises. All, or in any event, most of that testimony was directed at what it would cost to replace the equipment instead of what its reasonable rental value was. Based on our thorough review of the record, we cannot say that the trial court abused its "much discretion" in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979).
As a final matter, the trial court committed a mathematical error in allocating the proceeds of the sale of oil after RLS Partnership commenced operations. In discharging our duty of rendering any judgment which is just, legal, and proper upon the record on appeal, we must correct that error. LSA-C.C.P. art. 2164.
*1381 The record shows that on November 25, 1979, RLS Partnership sold to Placid Oil Company 103.7 barrels of oil produced from the Woods No. 1 Well. The gross income derived from this sale was $3,366.10. After deducting severance tax and that portion of the proceeds paid to the royalty interest owners, the net proceeds for distribution among the working interest owners totaled $2,580.01. Defendants are entitled to a portion of these proceeds representing oil produced by them and stored in the tanks prior to the RLS Partnership operations. At the trial one of RLS Partnership's employees, Monte Atkins, testified that he personally gauged these tanks after RLS Partnership acquired its lease from the Woods family. Upon inspection, he found that one tank contained 1'8" of fluid and the other contained 1'4" of fluid. In converting the tank measurement in feet and inches, a conversion factor of 1.17 barrels per inch is applicable to these tanks. Using this conversion table, 42.1 barrels of fluid were produced by defendants instead of 11.1 barrels as found by the trial court. Using the net proceeds figure, the oil was sold for $24.87 a barrel. This price times defendants' 42.1 barrels, equals $1,047.02 to which amount defendants are entitled. The remaining $1,532.99 belongs to plaintiffs.
For the above and foregoing reasons, the judgment appealed from is affirmed insofar as it ordered cancellation of the mineral lease as is the judgment insofar as it grants defendants $3,500.00 for use of its equipment.
The judgment of the trial court is reversed and set aside insofar as it awarded plaintiffs attorney's fees.
The judgment of the trial court is amended to reduce plaintiffs' allocation of proceeds from oil sales from $2,288.98 to $1,532.99 and to increase defendants' allocation from $291.03 to $1,047.02.
Costs of this appeal are taxed one half to plaintiffs-appellees and one half to defendants-appellants.
AMENDED IN PART AND AFFIRMED AS AMENDED; AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] The record does show that on September 22, 1978, plaintiff, thinking the lease had expired, made written demand for its cancellation. However, the lease was still valid. When the lease expired in 1979, a new demand for its cancellation was required.