416 So.2d 290 (1982)
TRINIDAD PETROLEUM CORPORATION, Plaintiff & Appellee,
v.
PIONEER NATURAL GAS COMPANY, et al., Defendants & Appellants.
No. 8788.
Court of Appeal of Louisiana, Third Circuit.
May 27, 1982.
*291 Liskow & Lewis, Lawrence P. Simon, Lafayette and Provosty, Sadler & deLaunay, David P. Spence, Alexandria, Wm. Henry Sanders, Jena, Plauche, Hartley, Lapeyre & Ottinger, Patrick S. Ottinger, Lafayette, Gaharan & Wilson, Joseph Wilson, Jena, for defendants & appellants.
J. P. Mauffray, Jr., Jena, Broadhurst, Brook, Mangham, Hardy & Reed, George Hardy, III, Lafayette, for plaintiffs & appellees.
Before CULPEPPER, DOMENGEAUX, FORET, SWIFT and DOUCET, JJ.
CULPEPPER, Judge.
This case has previously been before us and before the Louisiana Supreme Court. See 391 So.2d 21. After we remanded to the District Court, the case was tried on the merits and is now before us again on appeal.
The present appeal and two appeals consolidated with it arise out of the blowout and abandonment of three shallow gas wells in the Wilcox formation in LaSalle Parish. The plaintiff, Trinidad Petroleum Corporation (hereinafter "Trinidad"), is the lessee, and defendant, Pioneer Natural Gas Company (hereinafter "Pioneer"), is the lessor under an oil, gas and mineral lease covering 480 acres of land on which the three wells were located. The last production under the Trinidad lease was on November 20, 1974, when its last well blew out. Approximately 14 months later, on February 16, 1976, Pioneer entered into a new lease with Royal Mineral Corporation (hereinafter "Royal"), who in turn assigned the new lease to MBM Partnership (hereinafter "MBM"), and MBM proceeded to drill and produce three or four new gas wells. Trinidad filed the present suit on June 29, 1976, contending its lease was still in effect under the force majeure clause, and that it was entitled to damages against Pioneer, Royal and MBM for trespass, breach of contract and conversion of the gas produced by MBM.
The first companion case is Jim Ratliff, et al. v. Charles Beard, et al., 416 So.2d 307, No. 8789 on our docket, which was consolidated with the present matter for trial and appeal. In that case Ratliff and Royal Mineral Corporation, of which he is president, sued Charles D. Beard, Jr. individually and as president of Trinidad for damages for defamation of Ratliff's character, *292 financial losses, etc. allegedly caused by the actions of Beard and Trinidad in disturbing Royal's possession of the lease which it acquired from Pioneer and in accusing Ratliff of the theft of a pump which Trinidad had left on the leased premises. A separate judgment is being rendered by us this date in that case.
The third case, Trinidad Petroleum Corporation v. Pioneer Natural Gas Company, et al., 416 So.2d 310, No. 8855 on our docket, arises out of the sequestration by Trinidad of all minerals produced or revenues received from the sale of minerals by Pioneer, Royal and MBM. After the trial of the present case, resulting in judgment in favor of Trinidad recognizing its lease and its ownership of all gas produced or revenues received under the MBM lease, Pioneer, Royal and MBM filed motions for a suspensive appeal, but only Pioneer perfected a suspensive appeal by filing a suspensive appeal bond. The other two defendants, MBM and Royal, perfected only devolutive appeals. Trinidad then sought to execute its judgment against Royal and MBM by seizing the property sequestered. Royal and MBM filed an exception to the jurisdiction of the trial court on the grounds that since the matter had already been appealed suspensively by Pioneer, the trial court no longer had jurisdiction. The trial court sustained the exception to its jurisdiction, and from that judgment Trinidad appeals. A separate judgment is this day rendered by us in that case.

ISSUES
The issues in the three cases are: 1. Are the previous decisions of the Supreme Court or the Court of Appeal res judicata as to defendants' contention that Trinidad's lease is terminated? 2. Is Pioneer estopped to deny the continued existence of Trinidad's lease? 3. Was Trinidad's lease continued in effect under its force majeure provisions? 4. Is Trinidad entitled to damages for Royal's conversion of a well pump left by Trinidad on the leased premises?

RES JUDICATA
Trinidad's first argument is that the defendants are barred by res judicata from contending the Trinidad lease has terminated. As is shown by our prior decision at 391 So.2d 21, in prior decisions by this Court, 381 So.2d 834, and by the Supreme Court, 381 So.2d 808, the issue was whether the trial judge erred in sustaining defendants' exceptions of no right and no cause of action, and dismissing plaintiff's suit. The final decision by our Court overruled the exceptions of no right and no cause of action and remanded the case to the district court for trial on the merits. Trinidad contends that the prior decisions by this Court and by the Supreme Court constitute res judicata. This argument has no merit. The prior appellate decisions overruling the exceptions of no right and no cause of action and remanding the case for trial do not constitute res judicata as to the trial on the merits.

ESTOPPEL
Trinidad contends that Pioneer is estopped from denying the continued existence of Trinidad's lease. This contention is based on evidence that following the blowouts of # 2 and # 3 wells in November of 1974 and the cessation of all production, Mr. Beard, president of Trinidad, and Mr. Alexander, geologist for Trinidad, met in Amarillo, Texas during December of 1974 with Mr. Bill Mobley, vice president of Pioneer, and Mr. Earl Mathis, land manager for Pioneer. These four gave contradictory versions of what was said at that meeting.
Beard testified that after he lost the income from the three wells he was in financial difficulty and was concerned about the expense of controlling the blowout of # 2 well. He wanted to reach some agreement with Pioneer whereby he could retain the lease, because he thought there were unproduced gas reserves under the proven portion, i.e., the SE/4 and the SE/4 of the NE/4 of Section 19. Beard admits that he discussed with Mobley or Mathis the problem *293 of Trinidad having a contract to sell the gas it produced under the Pioneer lease to Central Louisiana Electric Company (or a subsidiary thereof) for 17¢ per 1,000 cubic feet, which price was much lower than the then market price. Beard and Alexander suggested the possibility that the lease to Trinidad be canceled and a new lease entered into with Alexander, in order to avoid Trinidad's gas sale contract with CLECO. Beard testified his understanding at the conclusion of the meeting was that he would let Pioneer know whether he wanted to abandon the existing Trinidad lease and try to negotiate a new lease. Alexander's version of the meeting was substantially the same as that given by Beard.
However, the version given by the Pioneer officials, Mobley and Mathis, was different. They stated they understood Trinidad had abandoned or would abandon the lease and that Beard and Alexander wanted a new lease from Pioneer to Alexander with a 3/16 royalty. Mobley and Mathis said they wanted a ¼ royalty, and that they did not agree to the 3/16. These officials deny any knowledge that Trinidad was claiming continuation of the lease under force majeure.
The Pioneer version of the Amarillo meeting is strongly corroborated by a report sent by Beard to the individual investors who had an interest in Trinidad's wells on the Pioneer lease, which report was made in November or December of 1974 and stated that all production from the lease was terminated, that this was "the last of the Pioneer lease," and that the lease would probably be sold for salvage. Also corroborating Pioneer's version is the fact that following the Amarillo meeting Pioneer received from Alexander an offer to take a new lease with a 3/16 royalty. Pioneer was not interested in the offer because it wanted ¼.
Following the meeting in Amarillo in December of 1974, Pioneer received no further communications from Trinidad, no more royalty checks were received after January of 1975, and there were no activities by Trinidad on the lease, except those required by the terms of the lease or by the Department of Conservation of the State of Louisiana in connection with controlling the blowout of # 2 well and cleaning up the surface.
The jurisprudence on equitable estoppel is clear that this doctrine is not favored in the law and will not be applied unless three elements are present: (1) a representation by conduct or words; (2) justifiable reliance; and (3) a change in position to ones detriment because of the reliance. Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975). In this case there was no representation by Pioneer's words or actions that it would not deny the continued existence of Trinidad's lease. Even accepting as true Beard's testimony that he was to let Pioneer know whether he would formally release the Trinidad lease, so that Alexander could obtain a new one, the subsequent events show that Alexander's offer for a new lease was not acceptable to Pioneer and Beard never did communicate with Pioneer during the 14 months before it leased to Royal. Clearly, Beard did not rely to his detriment on what was said or done by Pioneer.

MAP OF LEASED AREA AND WELLS
The Trinidad lease (shaded area) and the wells discussed are shown on the following map:
*294 

DECISION BY THE TRIAL JUDGE
In his written reasons for judgment, the trial judge gave the following chronology of events and statements of facts found by him:
"DATES
11/06/69-Pioneer lease to Nelson Oil (subsequently assigned to Trinidad).
02/04/70-Trinidad recompletes Number 17 well.
05/25/70-Trinidad spuds Number 2 Well.
06/27/70-Trinidad spuds Number 1 Well.
09/10/70-Trinidad spuds Number 3 Well.
09/14/70-Trinidad spuds Number 4 Well.
12/08/70-Trinidad recompletes Number 17-A Well.
09/05/72-Trinidad abandons Number 4 Well as depleted.
11/03/73-Trinidad abandons Number 17-A Well as depleted.
06/28/74-Number 1 Well blows out and is plugged and abandoned.
11/17/74-Number 2 Well blows out uncontrolled.
11/20/74-Number 3 Well shows blowout condition and is plugged.
*295 12/04/74-Charles Beard meets with Pioneer in Amarillo.
07/22/75-Number 2 Well bridges over.
02/16/76-Pioneer leases to Royal Mineral Corporation.
04/20/76-Pioneer/Royal lease recorded.
06/29/76-Trinidad versus Pioneer, et al, filed.
08/25/76-Royal spuds MBM-Pioneer Number 1 Well.
10/28/76-Royal Mineral Corporation assigns its' lease to MBM Partnership.
11/04/76-MBM completes MBM-Pioneer Number 1 Well.
"These facts were established as true at the trial of this matter.
1. Trinidad acted as a reasonable and prudent operator in drilling and completing the Number 2 and Number 3 Wells.
2. Trinidad acted as a reasonable and prudent operator with regard to the Number 2 and Number 3 Wells after the Number 1 Well had blown out.
3. Trinidad acted as a reasonable and prudent operator in its' attempts to control the blowout of the Number 2 Well doing everything humanly possible, within reason, to control the situation.
4. The blowout of the Number 2 Well was beyond the control of Trinidad and was not preceded by any negligence or imprudence on Trinidad's part.
5. Trinidad could not have reasonably redrilled the lease before Pioneer granted a new lease to Royal because;
a. It was not safe to drill in the areas of the Number 2 and Number 3 Wells where there was a reasonable expectation of finding minerals in paying quantities for a period of six (6) months to one (1) year after the Number 2 Well had bridged over in July of 1975.
b. It was not reasonable for Trinidad to drill anywhere else on the leased premises because there was no likelihood that minerals would be found in paying quantities in such locations.
6. Trinidad, acting through its' president, Charles D. Beard, Jr., never intended to abandon the lease and made this fact know to Pioneer.
7. Pioneer acted in bad faith in concert with Royal Mineral Corporation, Jim Ratliff, and MBM Partnership to circumvent Trinidad's rights in and to the leased premises and to convert the minerals to be produced therefrom.
8. 505,478 mcf were produced from the leased premises through November 30, 1980, in violation of Trinidad's rights. Additional amounts, uncertain at this point, have been produced from November 30, 1980 to the present. The fair market value of such natural gas was approximately $2.40 per mcf at the time of trial."
Pursuant to the above findings, the trial court rendered judgment in favor of Trinidad recognizing its mineral lease on the 480 acres and awarding damages in favor of Trinidad and against Pioneer, Royal and MBM in solido in the sum of $909,860, representing the market value of the minerals produced by MBM without offsetting the costs of drilling or production.

REASONS FOR OUR REVERSAL
In view of the findings by the trial judge not only that Trinidad had maintained its lease under the force majeure clause, but that Pioneer, Royal and MBM were in bad faith as to the new lease, we have carefully studied the voluminous record of the 7-day trial. Nevertheless, we conclude the trial judge was clearly wrong for two equally valid reasons: (1) Under the force majeure clause, Trinidad had the obligation to commence drilling operations or resume production "from the leased premises," including those areas of the lease which Trinidad reasonably believed to be nonproductive, or to surrender those portions of the lease which it considered nonproductive. (2) The evidence shows clearly and unquestionably that Trinidad could have commenced drilling operations without danger in the SE/4 of the NE/4 of Section 19 within the delay provided by the force majeure clause of the lease.

TRINIDAD LEASE AND FORCE MAJEURE CLAUSE
The Trinidad lease was dated November 6, 1969 and was for a primary term of two *296 years. As stated above, Trinidad discovered and produced gas within the primary term, but its last production terminated with the blowout of the third well on November 20, 1974, thus terminating the lease under paragraph 5 which reads as follows:
"5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter"
Trinidad contends the lease continued because it was prevented from commencing new drilling operations or resuming production under the force majeure provisions of the lease which provide in pertinent part as follows:
"12. (a) The term "Force Majeure" as used herein shall mean and include: requisition, order, regulation or control by governmental authority or commission; exercise of rights of priority or control by governmental authority for National Defense or war purposes resulting in delay in obtaining or inability to obtain either material, equipment or means of transportation normally necessary in prospecting or drilling for oil, gas or other mineral, or in producing, handling or transporting same from leased premises; war; scarcity of or delay in obtaining materials or equipment: lack of labor or means of transportation of labor or material; Acts of God; insurrection; flood; strike, or other thing beyond the control of lessee.
(b) If by reason of Force Majeure as herein defined, lessee is prevented from or delayed in drilling, completing or producing any well or wells for oil, gas or other mineral on the leased premises, then while so prevented or during the period of such delay lessee shall be relieved from all obligations, whether express or implied, imposed on lessee under this lease, to drill, complete or produce such well or wells on the leased premises, and lessee shall not be liable in damages and this lease shall not be subject to cancellation for failure of lessee to drill, complete or produce such well or wells during the time lessee is relieved from all obligations so to do. Provided, this provision shall not relieve lessee from the necessity of paying rentals during the primary terms in order to continue this lease in force under the specifications of paragraphs 4 and 6 above.
(c) If upon or at any time after the expiration of the primary term hereof, while this lease is in force, lessee cannot maintain same in effect because prevented by Force Majeure from fulfilling the particular requirement (operations on or continued production from the leased premises, as the case may be) necessary so to do as specified in paragraph 2 hereof, then while so prevented and for six months thereafter this lease shall nevertheless continue in effect; and if within such six months lessee either commences operations on or resumes production from the leased premises, as the case may be, this lease shall continue in effect thereafter as though Force Majeure had not intervened. During any period this lease is continued in force after its primary term by Force Majeure as herein provided, lessee shall pay to the owners of the royalty hereunder, or to the credit of such owners in the depository bank above named, as royalty, an amount equal to $1 per acre per year for each acre retained hereunder. Such payments shall be made annually, and shall become due on each anniversary hereof while such Force Majeure continues, except the first payment shall be made within a reasonable time after occurrence of Force Majeure and shall be proportionate in amount to the unexpired portion of the then current year, if for less than a year. Nothing herein shall impair the right of lessee to release this lease as to all or any portion of the lands covered hereby and be relieved of all obligations hereafter accuring as to the acreage released."

TRINIDAD'S REASONABLY PRUDENT OPERATOR CONTENTION
Plaintiff's basic contention is that a "force majeure," under the terms of the *297 lease, is one which is beyond the foresight and control of a reasonably prudent operator. It relies on paragraph 12(a) which defines "force majeure" as including governmental orders, war, acts of God, flood, strike and then concludes with the broad definition "or other things beyond the control of the lessee." Trinidad also relies heavily on paragraph 12(d) which states:
"(d) The specification of causes of Force Majeure herein enumerated shall not exclude other causes from consideration in determining whether lessee has used reasonable diligence wherever required in fulfilling any obligations or conditions of this lease, express or implied, and any delay of not more than six months after termination of Force Majeure shall be deemed justified released."
Trinidad contends that under these provisions of the force majeure clause of the lease it must be judged by the standard of a reasonably prudent operator, and that as such it had no obligation to drill either on unproven portions of the 480-acre lease or on portions where it was too hazardous because of water sands near the surface being charged with gas by the blowouts. Plaintiff cites no Louisiana statute or jurisprudence which supports this interpretation of the force majeure clause.

OUR HOLDING TRINIDAD NOT RELIEVED OF DRILLING NONPRODUCTIVE AREAS
We do not agree with the above argument by Trinidad. We accept instead the argument by Pioneer that there is a distinction between the obligation of the lessee to develop and operate the property as a reasonably prudent operator and the obligation to commence operations for additional drilling or reworking within 60 days after all production ceases.
The so-called implied obligation of the lessee to act as a reasonably prudent operator was developed in our jurisprudence and codified in the Mineral Code, LSA-R.S. 31:122, as follows:
§ 122. Lessee's obligation to act as reasonably prudent operator
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
This implied obligation of the lessee to act as a reasonably prudent operator is read into every mineral lease and is the source of the obligations of the lessee to explore and develop the leased premises, to market the minerals produced, to protect the leased premises from drainage, and to restore the surface when operations are completed. See the comments under LSA-R.S. 31:122 and in particular the discussions from 5 Williams & Meyers, Oil & Gas, Chapter 8 (1969).
The obligation of the lessee to develop and operate as a reasonably prudent operator for the mutual benefit of himself and his lessor presumes the continued existence of the lease and applies to the lessee's stewardship while the lease is in existence. If the lessor thinks the lessee has breached this duty, the lessor is required to place the lessee in default before filing suit for cancellation of the lease. LSA-R.S. 31:135. However, the requirement that the lessor place the lessee in default before judicial proceedings to cancel the lease does not apply to the situation where the lease has terminated by failure of the lessee to commence operations within 60 days after cessation of production. Talley v. Lawhon, 150 La. 25, 90 So. 427 (1922); Woods v. Ratliff, 407 So.2d 1375 (La.App. 3rd Cir. 1981); Logan v. Blaxton, 71 So.2d 675, on rehearing (La.App. 2d Cir. 1954). Plaintiff has cited no case which applies either Article 135 or 122 in the present situation. Our conclusion is supported by the following discussion from 5 Williams & Meyers, Oil & Gas Law, Section 808, pages 56-57 (1980):
"It was indicated at the beginning of this section that the basic principle involved *298 in the cases under discussion was the duty of cooperation, which obliges both lessor and lessee to act in a manner conducive to the accomplishment of the lease purpose, namely, the exploration for and production of oil and gas. Several of the cases speak of cooperation explicitly, although others suggest that (where the lessor interferes with the lessee's performance) the lessee is relieved of his implied duties by virtue of the prudent-operator standard. In view of the simlarity between the implied covenant cases and the lease termination cases, we believe that the principle of cooperation is the proper explanation of the rule that excuses performance by the lessee when the lessor interferes with lessee's operations. The prudent-operator standard is not the proper explanation because it is inapplicable to operations necessary to keep a lease alive under a special limitation or condition. Indeed, if a third party interferes with operations required to extend the term of the lease, it would seem that the lease nevertheless terminates for lack of such operations." (Emphasis supplied)
The present case does not involve the implied obligation of the lessee to develop and operate as a reasonably prudent operator. This case involves the termination of the mineral lease upon the occurrence of an express resolutory condition, i.e., the cessation of production for a period of 60 days. LSA-R.S. 31:133.
Plaintiff contends it was relieved by a force majeure of the obligation to commence drilling or reworking operations within 60 days after cessation of production. The doctrine of force majeure, also sometimes referred to as "impossibility of performance," is found in LSA-C.C. Article 1933 which provides in pertinent part:
Art. 1933. Passive violation, putting in default required; exceptions
Art. 1933. When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter.
The rules contained in this and the preceding articles, however, are subject to the following exceptions and modifications:
* * * * * *
"2. Where, by a fortuitous event or irresistible force, the debtor is hindered from giving or doing what he has contracted to give or do or is from the same causes compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution of the contract.
3. There are two exceptions to the last rule: first, when the party in default has by his contract expressly or impliedly undertaken the risk of the fortuitous event, or of the irresistible force; secondly, if the fortuitous event, or case of force, was preceded by some fault of the debtor, without which the loss would not have happened."
LSA-C.C. Article 3556 contains the following pertinent definitions:
"14. Force.Force means the effect of power which can not be resisted.

Superior force. Those accidents are said to be caused by superior force, which human prudence can neither foresee nor prevent.
15. Fortuitous Event.Fortuitous event is that which happens by a cause which we can not resist."
Our jurisprudence has strictly limited the application of force majeure as an excuse for performance. In Logan v. Blaxton, supra, a mineral lessee under a lease containing a force majeure clause similar to that in the Trinidad lease, contended he was prevented from marketing the oil by excessive rains which made the road impassable for large transport trucks. The trial court sustained the force majeure argument by the lessee, but the Court of Appeal reversed, holding it was not shown it was impossible to improve these roads or to use smaller transport trucks or to foresee these seasonal rains. In Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (1967), the Supreme Court held that force majeure did not relieve the builder of a home where the foundation gave way due to shrinkage of the soil underneath *299 by large trees in close proximity, the reasoning of the court being that the builder should have foreseen the hazard. In the very recent case of Woods v. Ratliff, supra, this court held the mineral lessee was not excused under the force majeure clause where production ceased for more than 90 days because of a broken high speed gear in the pumping unit. The court held the lessee could have obtained the new part in time, although at additional expense. It is noteworthy that the court also held, as we do in the present case, that it was not necessary for the lessor to place the lessee in default, since the lease had already terminated by cessation of production. Of course, the party urging a suspensive condition, such as force majeure, has the burden of proof. F. C. Williams Real Estate v. Haydel, 364 So.2d 171 (La.App. 1st Cir. 1978); Dales Jewelers, Inc. v. Rice, 316 So.2d 416 (La.App. 2d Cir. 1975).
Much of the voluminous record and the lengthy briefs are devoted to the question of whether the application of force majeure is proscribed by the fault of the lessee in failing to foresee the blowouts or failing to take proper action to stop them. The evidence shows that all three wells blew out due to casing failure. Either corrosion or erosion caused subsurface holes in the casing, allowing gas to escape from the casing into the surrounding formations and come up outside the pipe to the surface. However, the plaintiff admittedly did not prove the cause of the corrosion or erosion of the casing. Some of the theories advanced by the experts were corrosion or erosion by salt water or other chemicals, by sand, or by electrolysis. But these are only theories. The cause of the casing failure was not proved.
As stated above in the chronology of events, the evidence shows that Trinidad # 1 well blew out on June 28, 1974 and was plugged and abandoned. Trinidad # 2 blew out on November 17, 1974 and was uncontrolled until it bridged over on July 22, 1975. Trinidad # 3 blew out on November 20, 1974 and was plugged and abandoned, thereby terminating all Trinidad production. Trinidad argues that although the cause of the casing failures was not proved, and despite the coincidence of the three wells blowing out within a period of six months, it proved it acted as a reasonably prudent operator, which, it contends, is the test for application of the force majeure clause. Trinidad proved that when these three wells were originally drilled in 1970, they were drilled by the same drilling contractor who was obligated to furnish good pipe, and that it was not at fault if the pipe was defective. Trinidad also introduced much evidence to show that after the # 2 well blew out and was uncontrolled, it did everything possible to control the well, but was unsuccessful and had to allow the well to bridge over.
On the other hand, Pioneer contends Trinidad had the burden of proving that the cause of the casing failure was not defective pipe or any deficiencies in drilling or operating the wells. In particular, Pioneer contends that after the # 1 well blew out, a reasonably prudent operator would have taken the precaution of inserting in the # 2 and # 3 wells one-inch strings of pipe to kill any possible blowouts in those wells. Pioneer argues persuasively that Trinidad had the burden of proving the cause of the casing failure was something beyond its foreseeability or control, which it has not done.
These are serious questions. However, we find it unnecessary to decide them. We conclude that even assuming for the sake of argument that Trinidad did act as a reasonably prudent operator, it was not relieved under the force majeure clause, from commencing operations for drilling or reworking on the leased premises within 60 days after cessation of production.
Trinidad contends it had no obligation to commence drilling or reworking on those portions of the lease which were not proven to be productive. Thus, Trinidad contends it had no obligation to drill on the NW/4 or the NW/4 of the NE/4 or the E/2 of the SW/4, since those areas had been condemned by dry holes and there was no evidence to show that they were productive. *300 Essentially, Trinidad is contending that for purposes of the force majeure clause the lease is divisible, and that it had no obligation to drill on areas not known to be productive, because a reasonably prudent operator would not do so.
On the other hand, Pioneer contends the lease is not divisible for purposes of force majeure. Pioneer emphasizes the distinction between the implied obligation to develop and operate as a reasonably prudent operator during the primary term of the lease and the obligation to commence drilling or reworking within 60 days after the primary term expires and production ceases. It argues that after the primary term expires and all production ceases, the lessee has the right either to continue the lease in effect by commencing drilling or reworking operations within 60 days or the right to allow the lease to expire. The lessee may prevent termination of the lease by commencing the specified operations within 60 days. Under the provisions of the last sentence of Section 12(c) of the force majeure clause, the lessee had the right to release any portion of the lands covered, and thereby be relieved of all obligations to commence drilling or reworking on the released portions. Trinidad chose not to release any portion of the leased acreage.
Trinidad argues that the above quoted last sentence of Section 12(c) gives it the right but not the duty to release lands covered by the lease. We conclude, as Pioneer contends, that although Trinidad did not have the obligation to release any portion of the leased acreage, it was required to make the choice of either releasing the areas it thought to be nonproductive or allowing those areas to remain subject to the obligation to commence drilling or reworking operations within 60 days after cessation of production. It seems clear to us that any acreage not released by Trinidad remained subject to the obligation of paragraph 5 of the lease to commence operations for additional drilling or reworking within 60 days after cessation of production. If there were no force majeure issue, the lessee would be obligated under paragraph 5 to commence operations for additional drilling or reworking within 60 days after cessation of production, and this obligation would extend to the entire leased acreage. Certainly, the lessee should not be permitted to contend that since he is urging force majeure he does not have to commence drilling or reworking operations except on known producing areas of the lease.

TRINIDAD COULD HAVE DRILLED WITHOUT DANGER ON SE/4 OF NE/4
We will now discuss the equally valid second grounds for concluding that Trinidad was not relieved by the force majeure clause, i.e., the evidence shows clearly that Trinidad was not prevented from drilling in the SE/4 of the NE/4 of Section 19 by any hazardous condition created by the blowouts of Trinidad # 1, # 2 or # 3.
Much evidence was produced by the parties regarding the hazard for further drilling created by the blowouts of the three wells. The evidence shows generally that the blowouts charged the water sands near the surface with gas, making it hazardous to redrill within a certain distance and a certain time. The evidence shows that in drilling a new well it would have been necessary to drill an open hole, from 100 to 200 feet deep, for the insertion of approximately 8-inch surface casing. The preponderance of the expert testimony is to the effect that if during the drilling of this open hole for the surface casing, water sands heavily charged with gas were encountered, there would be a blowout which could not be controlled, because blowout preventers could not be installed until surface casing was set and heavy mud could not be used during this drilling to control blowouts from an open hole.
However, there is a wide difference of opinion amongst the experts as to how far from each blown out well the water sands would be charged, and as to how long they would remain charged. The various estimates are set forth with fairness in Pioneer's brief as follows:

*301
"WITNESSES DISTANCE TIME (from
 bridge over
 or plugging &
 abandonment)
Willie Twiner in the adjacent 10 to 15 days
 quarter-quarter
 sections (40
 acres)
Earl Peavy 800' or 900' to 50 to 60 days
 one-quarter mile
Edwin Alexander one-quarter mile 1 year
Carey King slightly more "pretty soon"
 than 1000'
Hugh McDonald one-quarter mile 6 months to
 1 year"

Trinidad relies on the provisions of paragraph 12(c) that: "If upon or at any time after the expiration of the primary term hereof, while this lease is in force, the lessee cannot maintain same in effect because prevented by force majeure from fulfilling the particular requirement (operations on or continued production from the leased premises, as the case may be) necessary so to do as specified in paragraph 2 hereof, then while so prevented and for six months thereafter this lease shall nevertheless continue in effect; and if within such six months lessee either commences operations on or resumes production from the leased premises, as the case may be, this lease shall continue in effect thereafter as though force majeure had not intervened."
Under this provision, Trinidad contends it was relieved of the requirement to redrill during the existence of the hazardous condition and for six months thereafter. Under the testimony of the experts, Trinidad contends the hazard continued for one year after the # 2 well bridged over on July 22, 1975 which would be July 22, 1976, and for six months thereafter, which was long past February 16, 1976, the date of the Pioneer lease to Royal. Also, if a hazardous condition started with the blowout and plugging of # 3 well on November 20, 1974 and continued for a year thereafter, the hazard lasted until November 20, 1975, and six months thereafter would be May 20, 1976, which would be well past February 16, 1976 on which Pioneer leased to Royal.
However, even assuming Trinidad is correct as to the time and distance of hazardous conditions for wells # 2 and # 3, there is no evidence that the same was true as to # 1 well. The # 1 well blew out and was plugged and abandoned on June 28, 1974. One year after that would be June 28, 1975. Adding the six months force majeure period provided in paragraph 12(c) of the lease would extend to December 28, 1975 the time within which Trinidad was relieved of the obligation to drill. This was almost two months before the lease from Pioneer to Royal on February 16, 1976.
As to the distance which the hazardous area extended from the blown out wells, there is no expert opinion that this was more than one-quarter of a mile. A simple examination of the above map of the lease will show that the SE/4 of the NE/4 is more than one-quarter of a mile from the # 2 well and the # 3 well. Thus, the blowout of neither # 2 nor # 3 created a hazardous condition extending as far as the SE/4 of the NE/4 of Section 19. Only the # 1 well was within one-quarter mile of the SE/4 of the NE/4, but, as shown above, the blowout and plugging of # 1 well occurred more than the 18-month period before the lease from Pioneer to Royal.
Trinidad's answer to this argument is that the only conclusion which can be drawn from the expert testimony as a whole is that the farther away from and the longer after a blowout the safer it is. Trinidad argues you cannot simply draw a circle one-quarter of a mile away from the # 2 and # 3 wells and say that it was safe outside that circle. In this regard, we quote from the testimony of Mr. Hugh McDonald, Jr., plaintiff's own witness, who is highly qualified and on whom plaintiff relies heavily:
"Q It is my understanding that in response to the questions earlier posed, that your testimony was that charges from No. 2 would be expected to range for about a quarter of a mile from the site up above?
A I think that someone indicated to me that there were surface indications a *302 quarter of a mile away and naturally no one would know how far the charge would go. But I think that a quarter of a mile charge would be reasonable.
Q You would not, under normal conditions in the Wilcox sands, expect the charge to extend farther than that?
A I don't know that you could draw a line and say that you can move one foot less than a quarter of a mile or one foot further. It would be most difficult to draw a conclusion and say that you could not get any closer than a quarter of a mile.
Q I am certainly not trying to attach any limitations to your response. But your experience in the Wilcox sands and your opinion as a professional, that you would not under normal circumstances expect the charge to extend beyond a quarter of a mile, moreorless?
A That's a fair statement, yes, sir.
Q So you would not expect the blowout of the No. 2 well to charge the sands, under normal conditions, in the SE¼ of NE¼ of Section 19?
A I would think that that would be a little far to charge even though it's possible to charge that far, but I wouldn't think so. I think the gas would migrate to the surface before it got that far.
Q And it's also my understanding from your testimony that the fact that the sands around the Pioneer Natural Gas No. 1 were charged by that blowout, would not enhance the possibility of those sands becoming recharged because of the Pioneer Natural Gas No. 2 blowout.
A There would be no correlation. They could charge the same sands or they could charge different sands. The sand that becomes charged is the one that breaks down is the easiest that has the greatest permeability and verocity.
Q But by virtue of the fact that one blowout occurred here in 1973 and the Pioneer Natural Gas No. 2excuse me. Let me clarify that question for the record. There would be no accumulative effect by the blowout of the Pioneer Natural Gas No. 1 one year prior to the blowout of the Pioneer Natural Gas No. 2?
A I don't think that you could draw the conclusion. It may well in fact have happened that the same sand becomes charged from the No. 1 and from the No. 2. But I don't think that you can draw that conclusion."
To answer Trinidad's argument that under McDonald's testimony the hazardous area could have extended more than one-quarter mile from # 2 well, Pioneer has attached to its brief a sketch showing that even if we use 3/8 mile, the # 2 well is more than 3/8 mile from the SE/4 of the NE/4. Clearly, there is no evidence to show the charged sands extended as far as 3/8 mile.
The testimony of Mr. Edwin P. Alexander, plaintiff's geologist and close business associate during the drilling, production and blowouts of these wells and a witness for plaintiff in the present case, is that the SE/4 of the NE/4 of Section 19 was deemed to be within the producing area. Trinidad # 4, shown on the attached plat of the lease, had become depleted and was abandoned on September 5, 1972, but the area south of that in the SE/4 of the NE/4 was considered productive. After MBM acquired its lease from Royal, it drilled a well, shown on the attached plat as MBM Pioneer A # 2. The well is shown on the plat as a producer, but the production records of MBM filed in evidence do not show any production from this well. Nevertheless, the area was considered both by Mr. Alexander and later by MBM as productive, and MBM actually drilled a well there.

CONCLUSION ON FORCE MAJEURE
We conclude that Trinidad's lease was not continued in effect under the force majeure provisions thereof.

*303 TRINIDAD'S CLAIM AGAINST ROYAL FOR CONVERSION OF THE PUMP
In a supplemental petition in the present case, Trinidad sought damages against Royal for conversion of a salt water disposal pump which Trinidad left on the leased premises. Trinidad was using Trinidad, Louisiana Central Well # 17-A, shown on the above plat, for disposal of salt water from its wells # 1, # 2 and # 3. The pump was left on # 17-A.
The evidence shows clearly that after the lease by Pioneer to Royal in February of 1976, Royal's president, Ratliff, hired a contractor to move the pump in question from the leased premises to a salvage yard in Jena, where he intended to have it repaired for further use. Ratliff testified he understood it was a "custom" in the oil and gas industry for the new lessee to consider himself the owner of any equipment left on the lease by the prior lessee. No such "custom" could relieve Ratliff. Trinidad owned the pump, and Ratliff was guilty of conversion.
Following the removal of the pump by Ratliff, Mr. Beard, president of Trinidad, had Ratliff arrested for theft of the pump, and this is one of the grounds for damages for defamation sought by Ratliff in his companion suit against Trinidad, # 8789 on our docket.
The trial judge awarded Trinidad $2,753.76, representing the value of the pump, and the additional sum of $1,000 representing damages for the conversion. The evidence supports these awards. We will affirm them.

DECREE
For the reasons assigned, the judgment appealed is reversed and set aside as to the portion which recognizes Trinidad Petroleum Corporation as mineral lessee of the following tract of land:
The Southeast Quarter of the Northeast Quarter (SE-¼ of NE-¼);
The Northwest Quarter of the Northeast Quarter (NW-¼ of NE-¼);
The Northwest Quarter (NW-¼); The Southeast Quarter (SE-¼);
The West Half of the Southwest Quarter (W-½ of SW-¼) of Section 19, Township 11 North, Range 3 East, LaSalle Parish, Louisiana.
The judgment appealed is also reversed and set aside as to the award of damages in favor of Trinidad Petroleum Corporation and against Royal Mineral Corporation, Pioneer Natural Gas Company and MBM Partnership, in solido, for the sum of $909,860, together with interest thereon. The judgment appealed is also reversed and set aside as to the portion which maintains the writ of sequestration issued herein on March 28, 1977 in favor of Trinidad Petroleum Corporation and against Royal Mineral Corporation, Pioneer Natural Gas Company and MBM Partnership covering all natural gas produced and revenues received by said defendants, and the said writ of sequestration is hereby recalled and set aside. Otherwise than as reversed and set aside, the judgment appealed herein is affirmed, except that all costs in the trial court, including the fees of the expert witnesses, are assessed against the plaintiff. All costs of this appeal are assessed against the plaintiff.
REVERSED AND RENDERED IN PART, AFFIRMED IN PART.
DOUCET, J., dissents and assigns written reasons.
FORET, J., dissents for the reasons assigned by the district judge and those assigned by DOUCET, J.
DOUCET, Judge, dissenting.
I respectfully dissent, being of the belief that Trinidad maintained its lease under the force majeure provisions contained in the lease agreement.
For purposes of clarification the pertinent facts are summarized as follows. Trinidad Petroleum Corporation instituted this action for trespass, breach of contract, and conversion of minerals. Trinidad obtained the oil, gas and mineral lease in question by assignment on November 6, 1979 from Nelson Oil who theretofore had *304 obtained the lease from defendant Pioneer Natural Gas Company. Thereafter, Pioneer executed a second lease covering the same premises to Royal Mineral Corporation, who subsequently assigned the lease to MBM Partnership. Plaintiff alleges its lease was maintained in force, following the blowout of wells on the leased premises, by operation of the force majeure clause of the lease and, therefore, the granting of the second lease and lessee's operations upon the land were in violation of plaintiff's rights. The trial judge agreed and judgment was awarded in plaintiff's favor against defendants in solido in the amount of $909,860.00, based on the mineral production obtained by MBM under its second lease.
Between February 4, 1970 and December 8, 1970 Trinidad completed or recompleted six wells on the leased premises. Two of the wells were subsequently abandoned as depleted. In the latter part of 1973 a well known as the # 1 well, blew out and was subsequently plugged and abandoned on June 28, 1974. Subsequently, on November 17, 1974 Trinidad was informed that a pin-hole size gas leak had developed in the surface casing of the # 2 well. Efforts to control the well were thereafter conducted, including attempts to stabilize conditions through salt water disposal, however efforts proved unsuccessful and the well eventually blew out and became completely uncontrolled. A decision was subsequently made to let the well bridge over naturally, which it did on July 22, 1975. Plaintiff contends that lessor Pioneer was aware of these efforts and the costs incident thereto, hence Pioneer should be estopped from denying the continued existence of the lease. Meanwhile, it was discovered that the # 3 well was also in blowout condition.
Representatives of the lessee and the lessor met on December 4, 1974 to discuss the status of the Trinidad lease. On February 16, 1976, Pioneer granted its lease at a higher price to Royal. MBM Partnership subsequently drilled and produced several wells proximate to the Trinidad wells. Plaintiff's suit followed in June of 1976 wherein it was alleged that the blowouts were a force majeure which prevented Trinidad from conducting drilling or reworking operations on the lease so as to prevent the lease's expiration.
The trial judge determined that the facts showed Trinidad acted as a prudent and reasonable operator, both before and after the blowouts, and that Trinidad could not have reasonably redrilled the leased premises before Pioneer granted a new lease to Royal because it was not safe to drill in the areas of the # 2 and # 3 wells where there was an expectation of finding minerals in paying quantities for a period of six months to one year after the # 2 well had bridged over in July of 1975. Additionally, it was not reasonable for Trinidad to drill anywhere else on the leased premises because there was no likelihood that minerals would be found in paying quantities in such locations. Accordingly, under the terms of the force majeure provisions of the lease, as intended by the parties, the lease remained in force, thus defendants were liable for the breach thereof.
By contract and law Trinidad was absolved from liability for its nonperformance by the subsequent impossibility of performance without its fault. Indeed, under our law no damages can be recovered for nonexecution of a contract unless the party in default has by his contract expressly or impliedly undertaken the risk of fortuitous event or irresistible force. LSA-C.C. 1933. But the parties herein went further, seeking protection in such instances beyond that afforded by law. The loss occasioned by nonoperation of the lease should remain where the parties agreed to place it. Nevertheless, the majority decides otherwise for reasons this writer considers to be invalid for two reasons. First, I consider the construction given Art. 1933 by the majority to be overly restrictive. See 21 Tul.L.Rev. 603. Moreover, to construe the parties' contract to be a mere replication of Art. 1933 is to render the agreement provisions meaningless redundancy. I do not believe such was the intent of the parties. Instead, I believe, as did the trial judge, it was the parties' intention that the force majeure clause would excuse the lessee's *305 nonperformance under the circumstances presented herein.
The force majeure clause in dispute, by its clear terms, relieved plaintiff of its obligation to commence drilling or reworking within 60 days after cessation of production. It provides that when the lessee is prevented from or delayed in drilling, completing or producing any wells due to Acts of God or other things beyond the control of the lessee, then while so prevented or delayed and for six months thereafter lessee shall be relieved from all obligations except payment of force majeure rentals and lessee shall not be liable in damages and the lease shall not be cancelled. The force majeure provisions further provide that the lessee maintains the "right" (not obligation) to release any or all portions of the lands covered. Nowhere in the lease is the lessor granted the right to compel the lessee to exercise this right and relinquish any lands.
The record discloses that Trinidad timely acted to maintain the lease under the above provisions. Expert testimony was presented at trial that hazardous conditions existed for one year after the # 2 well bridged over on July 22, 1975. Being a reasonably prudent operator, Trinidad would not drill while there was a hazard to life or property. Ed Alexander testified that the only place a reasonably prudent operator would drill a well capable of producing minerals in paying quantities would be in the SE¼, or the area charged by the blowouts of the # 2 and # 3 wells. Once the danger subsisted, on or about July 22, 1976, Trinidad had six months, according to the terms of the parties' contract, within which time to take actions to maintain the lease.
Admittedly other areas of the leased premises existed during this term where the hazards created by the blowouts were minimal or nonexistent. However, there was no likelihood of finding minerals in paying quantities in these areas. Dry holes had been drilled in the SW¼ of the SW¼, the middle S½ of the NW¼, the NE¼ of the NE¼, and the SW¼ of the NE¼. Ed Alexander was of the expert opinion that the NW¼ was low and therefore not a likely prospect. The record further shows that the SE¼ of the NE¼ had been depleted by the Trinidad # 4 well. This fact was confirmed by the subsequent drilling of the MBM # 2 well, which proved to be a dry hole. Thus prudent production was limited to the SE¼, however, the blowouts in this area created a hazardous condition delaying its development.
Furthermore, I believe, as did the trial judge, that Trinidad in fact sustained its burden of proving a force majeure by a preponderance of evidence. The piping involved in the blowouts was not installed by Trinidad. Although the exact cause of the casing failures was not shown, the record discloses that Trinidad acted as a prudent operator at all times. Admittedly testimony was introduced to the effect that, viewed from hindsight, other possible causes of action could have been taken by Trinidad following the blowouts, however, the evidence does not indicate that plaintiff's conduct fell below the standard of care set forth in the parties' contract. Trinidad established that the casing failures were not the result of its own neglect; it was not required to prove an Act of God.
The trial judge correctly applied the reasonably prudent operator standard to determine the existence and duration of a force majeure. LSA-R.S. 31:122 expressly sets forth the standard of care required of a mineral lease:
"A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee."
Section 122 has as its origin Civil Code Article 2710 which requires that a lessee enjoy the thing leased as a good administrator. Had the parties desired to establish a higher standard of care they could have done so. However, contrary to the construction imposed by the majority, the lease agreement reveals nothing indicative of the *306 parties' intent to establish a higher standard. If anything, it appears their intention was otherwise inasmuch as § 12(d) of the lease provides: "The specification of cause of Force Majeure herein enumerated shall not exclude other causes from consideration in determining whether Lessee has used reasonable diligence wherever required in fulfilling any obligations or conditions of this lease..." (emphasis added) The parties did not stipulate what would constitute reasonably prudent conduct or reasonable diligence, however, one would not expect them to do so in that there are too many unknown factors inherent in such a leasing transaction, e.g.geology, reservoir mechanics, conservation regulations, economic conditions. The lessor and lessee could not reasonably be expected to specify how all future operations would be conducted, thus a reasonable prudence standard is imposed by law, affirmed by contract. Accordingly, I cannot agree that the trial judge erred in applying such a standard, and believe the majority abrogates the very freedom of contract granted by both the Mineral Code, § 3, and the Civil Code, Art. 11.
Furthermore, the majority holds that the lessor was not required to place the lessee in default. I cannot agree. The lease had not expired by its own terms as the force majeure clause granted Trinidad six months from cessation of the force majeure to continue the duration of the lease. Trinidad contends that it was justified in not making force majeure payments[1] during the existence of the irresistible force since such payments had been waived by Pioneer. However, even if this contention is to be rejected, such payments were designated in the lease as royalties and therefore were subject to the provisions of LSA-R.S. 31:135 et seq.[2] LSA-R.S. 31:137 provides in unequivocal terms:
"If a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he must give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease."
LSA-R.S. 31:141 provides as follows:
"In a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice."
LSA-R.S. 31:142 states:
"A mineral lease may be dissolved partially or in its entirety. A decree of partial dissolution may be made applicable to a specified portion of land, to a particular stratum or strata, or to a particular mineral or minerals."
From the foregoing it becomes clear that Pioneer was required to give its lessee notice of failure to pay royalties. Thereafter Trinidad would have had thirty days within which to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment, pursuant to LSA-R.S. 31:138, thereby affording Trinidad an opportunity to remedy the breach. This litigation, including two proceedings at both the trial and intermediate court levels as well as proceedings in the Supreme Court, might have been avoided had Pioneer complied with the requirements of R.S. 31:137.
Even if Pioneer had complied with the aforementioned provisions, total dissolution of the lease would not be appropriate. R.S. 31:142. Such a result is further supported by the parties' contract which provides for partial dissolution of the lease upon Trinidad's release of any of the lands covered. Clearly, the parties intended the lease to be divisible.
Contradicted is whether Trinidad communicated the blowout situation and its intention to maintain the lease to Pioneer. Both parties offer opposing versions. The trial *307 judge considered Trinidad's version to be credible and the record supports his determination. Trinidad expended thousands of dollars in efforts to control the blowout at the # 2 well. As late as April of 1975, Trinidad's president, Mr. Beard, met with officials from the Department of Conservation to discuss the situation. Conversely, Pioneer, by breach of its agreement with Trinidad, secured for itself an increased royalty, from 1/6 to ¼, and a tenfold increase in the beginning purchase price. The trial judge's determination of the true state of affairs should not be disturbed.
In conclusion, I agree with the majority that prior appellate decisions overruling the exceptions of no cause of action and remanding the case for trial does not constitute res judicata, vis-a-vis application of the force majeure clause to the facts of the case, as to trial on the merits. In all other regards, I respectfully dissent for the reasons set forth above.
NOTES
[1] The lease provided for such payments in an amount equal to $1.00 per acre per year for each acre retained.
[2] "The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases subject to the following modifications."