406 So.2d 636 (1981)
Roger REBSTOCK
v.
BIRTHRIGHT OIL & GAS CO., et al.
Bussie REBSTOCK, et al.
v.
BIRTHRIGHT OIL & GAS CO., et al.
Nos. 14304, 14305.
Court of Appeal of Louisiana, First Circuit.
October 12, 1981.
Writ Denied December 14, 1981.
*637 Edward T. Diaz, Henry J. Lafont, Jr., Golden Meadow, for plaintiffs.
Christopher E. Janke, New Orleans, for Birthright Oil & Gas Co.
Charles A. O'Niell, Jr., New Orleans, in pro. per. and for Gene McCutchin.
Before ELLIS, LOTTINGER and PONDER, JJ.
ELLIS, Judge.
The written reasons assigned by the trial judge herein thoroughly cover the facts and the law and properly dispose of all issues presented by this appeal. For the reasons therein stated, which we adopt as our own and attach hereto as an appendix, the judgment appealed from is affirmed, at plaintiffs' cost.
AFFIRMED.
APPENDIX
ROGER REBSTOCK 17TH JUDICIAL DISTRICT COURT
VERSUS NO. 39911
BIRTHRIGHT OIL & GAS COMPANY, ET AL PARISH OF LAFOURCHE
CONSOLIDATED WITH:
BUSSIE REBSTOCK, ET UX STATE OF LOUISIANA
VERSUS NO. 39912
BIRTHRIGHT OIL & GAS COMPANY, ET AL DIVISION "A"

REASONS FOR JUDGMENT ON EXCEPTIONS OF NO RIGHT AND NO CAUSE OF ACTION
I. FACTS
On September 19, 1972, Roger Rebstock granted an oil, gas, and mineral lease to Birthright Oil & Gas Company on a certain tract of land owned by him, which measured approximately one-quarter arpent wide by forty arpents in depth containing approximately ten acres which property was located on the left or east descending bank of Bayou Lafourche near the Town of Golden Meadow, in Section 30, T 19 S, R 22 E, in Lafourche Parish, Louisiana. This lease was recorded in the Conveyance records of Lafourche in COB 481, folio 210, under entry number 361030 on November 7, 1972. This lease was for a primary term of three years, and provided for one-sixth royalties on oil and gas produced.
On September 19, 1972, Mrs. Avilia St. Pierre Rebstock and Bussie Rebstock granted two oil, gas, and mineral leases to Birthright Oil & Gas Company on tracts of land owned by them near the town of Golden Meadow, in Lafourche Parish, Louisiana. The first tract measures one-half arpent in width by forty arpents in depth and is located on the left or east descending bank of Bayou Lafourche in Section 30, T 19 S, R 22 E, and contains approximately twenty acres. The second tract measures one-fourth arpent front by forty arpents in depth and is located on the left or east descending bank of Bayou Lafourche, in Section 30, T 19 S, R 22 E, and contains approximately ten acres.
These two leases were recorded in the Conveyance records of Lafourche Parish, on November 7, 1972, in COB 481, folio 214, under entry number 361031, and COB 481, folio 218, under entry number 361032 respectively. Both of these leases have primary terms of three years and provide for one-sixth royalty payments on oil and gas produced.
On March 18, 1974, Birthright Oil & Gas Company assigned the three leases described *638 above to Charles A. O'Niell, Jr., in so far as those leases affected the strata and horizons above the depth of 5,650 feet, subject to various reservations of overriding royalty interests. This agreement was recorded in the Conveyance records of Lafourche Parish, on March 25, 1974, in COB 509, folio 445, under entry number 384678.
During the later part of 1974, Gene McCutchin successfully completed a gas and condesate well between the depths of 1,509 and 1,521 feet on property belonging to A. J. Simoneaux and others located in Section 29, T 19 S, R 22 E, near the properties leased and described above.
On February 18, 1975, following publication and notice as required by law, the Commissioner of Conservation for the State of Louisiana held a hearing to determine whether or not to create a single drilling and production unit around the Gene McCutchin-A. J. Simoneaux No. 1 Well.
By order dated March 10, 1975, effective March 1, 1975, the Commissioner of Conservation force pooled portions of the properties described in the leases herein into a production unit containing approximately 477.4 acres for the production of the 1,500 foot sand, Reservoir A, in the Golden Meadow Field around the Gene McCutchinA. J. Simoneaux No. 1 Well. Gene McCutchin was designated as the unit operator. Mrs. Avilia St. Pierre Rebstock and Bussie Rebstock had 16.1966 acres of their property placed in the unit which represents 3.3927 per cent of the property in the unit. Roger Rebstock had 5.5004 acres in the unit or 1.1522 per cent of the property in the unit.
By instrument dated September 18, 1975, effective July 9, 1975, Charles A. O'Niell, Jr., assigned his interest in the leases herein question insofar only as they affected strata above 3000 feet to Gene McCutchin and Mrs. Alma Porter McCutchin, subject to certain reservations and terms. This agreement was recorded in the Conveyance records of Lafourche Parish, on October 8, 1975, in COB 549, folio 888, under entry number 413474.
By letters dated September 26, 1975, O'Niell sent division orders to Roger Rebstock, Bussie Rebstock, and Avilia St. Pierre Rebstock, for execution. In reply to this correspondence, O'Niell received a letter from Bussie Rebstock dated October 5, 1975, stating as follows:
In reference to your letter of September 26, 1975 with enclosures please be advised that I do not want anything to do with these papers as the lease on this property expired on September 19, 1975.
If you desire that I sign these papers and renew the lease I would appreciate very much you talking to me in person.
If you feel that you do not wish to speak to me I would appreciate your sending the release to this property. Please send this release as soon as possible so that I may register with the Clerk of Court in Thibodaux.
By letter dated December 14, 1976, O'Niell wrote to Mr. Edward T. Diaz, counsel for the Rebstocks as follows:
Am trying to understand the nature of the differences between the Rebstocks and me.
They granted leases to Birthright Oil & Gas Company dated September 19, 1972, recorded in C.B. 481, folios 214 and 218. Birthright assigned the leases to me insofar as they cover the rights to 5,560 feet, by instrument dated March 18, 1974, recorded in C.B. 509, folio 445. Thereafter the leases were included in Simoneaux gas unit, by order of the Department of Conservation. I emphasize: the unit was created by paramount authoritynot by me as a voluntary unit under the lease provisions.
In Thibodaux yesterday, I saw that Birthright took new leases from the Rebstocks about a year ago. These leases have the status of "top leases" and do not affect the original leases insofar as my right (to 5,560 feet) are concerned, which are held by the Simoneaux gas production.
I am told that Birthright gave a release to the Rebstocks on the original leases when the second leases were taken. There in no such release on record in Thibodaux. Of Course, the release would *639 have no importance as far as my rights to 5,560 feetare concerned.
Where do we differ? The facts are clear. The Rebstocks are entitled to royalties under one lease and rentals under the other. It seems to me they are in good shape.
In a letter received on June 20, 1978, Bussie Rebstock wrote to Gene McCutchin as follows:
just a few line to let you know that it gone on three years that Gene McCutchin. A.J. Simoneaux Well No. 1 Produce Gas I like you to know that we got a share in that Well I hope We can get alone with that Problem because you know you don't have a lease on our Property you force us in the Pool so I wish We can settle it without gone in court and if I get to go I see a lowyer I belive We don't have to do that Please let me hear from you on this
By a letter dated June 27, 1978, O'Niell replied on behalf of McCutchin to Diaz, the attorney for the Rebstocks, as follows:
You client, Bussie Rebstock, has written Gene McCutchin direct. Copy of his letter is enclosed.
Our position is unchanged: our lease from Bussie Rebstock is valid and effective and royalties thereunder will be paid to him provided he signs a division order.
By a letter dated January 18, 1979, Diaz made a demand on behalf of Avilia St. Pierre Rebstock and Bussie Rebstock to John M. McCollam, attorney as follows:
Mr. Bussie Rebstock has requested that I write to you as a follow up to our correspondence.
The leases by Avilia St. Pierre Rebstock and Bussie Rebstock, in our opinion have expired.
We wish to further advise that according to the language in the leases, the property in question could not be pooled by you, and any pooling by the State would not inure to you, but to Mr. Rebstock.
The records reflect that the well is paid for so we do hereby request that your client pay 8/8's of its production, after costs, to my clients.
Should this not be done on or before 5:00 O'clock P.M. February 15, 1979, I have been authorized to file suit to have this lease cancelled and to seek recovery of the 8/8's of production plus appropriate damages.
The instant suits were filed on May 21, 1979, against Birthright Oil & Gas Company and Gene McCutchin. Both of these suits contended that because special clauses in both leases provide that production above ten thousand feet shall not be pooled with any other tracts, that the leases could only be maintained by actual production from the leased premises, or production below ten thousand feet from property with which the leased property was pooled.
Paragraph 10 of each suit alleges as follows:
That petitioners have not received any payments whatsoever for the production, attributable to their properties as a result of the forced unitization of their property by the aforesaid State Unitization Order, and for that reason the leases described herein are now expired and should be cancelled, because of the failure to product oil & gas, as provided in said leases, and in the alternative, should production be attributable to said leases because of the forced unitization, that the leases have terminated because of the failure to pay petitioner any portion of said production.
On August 24, 1979, Diaz wrote to McCutchin on behalf of the plaintiffs as follows:
I represent Bussie Rebstock, Mrs. Avilia St. Pierre Rebstock, and Roger Rebstock concerning the A. J. Simoneaux Well No. 1. and the production Unit created by Department of Louisiana Conservation Order No. 14-K, Lafourche Parish, Louisiana.
Enclosed is a copy of Law Suits filed by my client to compel cancellation of the leases on Birthright Oil Company.
Would you please advise why the 8/8 royalties due to the Rebstocks have not been paid to them?
*640 And, if any funds are being paid to any one other than the Rebstocks, who those parties are, and by what authority the funds are being paid.
I am in touch with the attorneys for Birthright, and unless we receive some explanation as to where the Rebstock funds are being paid, we will be compelled to file suit against you, as operator for an accounting.
My clients have always been disposed to amicable discussions, but not having heard anything from you they now want to press forward to collect their money.
On October 11, 1979, an Amending and Supplemental Petition was filed in suit number 39912, adding Charles A. O'Niell, Jr., as a party defendant. No such Amending and Supplemental Petition was filed in suit number 39911, and O'Niell is not presently a party to that action.
By checks dated January 23, 1980, Gene McCutchin tendered royalty payments from commencement of production through November 1979, in the amount of $497.82 to Roger Rebstock and $1,465.82 to Bussie Rebstock and Mrs. Avilia St. Pierre Rebstock.
On March 7, 1980, the plaintiffs in both of these matters filed Second Amending and Supplemental Petitions alleging compliances with R.S. 31:137 by notifying the defendants of non-payment of royalties in writing by letters of June 20, 1978, June 18, 1979, and August 24, 1979, and by the filing of suit.
II. TERMINATION OF LEASES FOR FAILURE TO DRILL ON AND PRODUCE FROM ACTUAL LEASE PREMISES DURING PRIMARY TERM
Each of the petitions allege that the leases between the parties contain the following provision:
Notwithstanding anything to the contrary herein contained, any reference to pooling of the property herein leased shall be contruded to mean any production below the depth of 10,000 feet. Specifically, any production above 10,000 feet shall not be pooled with any other tracts of land.
The plaintiffs claim that this clause means that unless there is actual drilling and production on the leased premises within the primary term or production in a pooled unit below 10,000 feet that the lease terminates at the end of the primary term, and that production in a pooled unit above 10,000 feet where the unit well is not located on the lease premises does not serve to maintain the lease in full force and effect.
The contract between parties is the law between them and the Courts are obligated to give legal effect to such contracts according to the true intent of the parties. Article 1945, Louisiana Revised Civil Code; Odom v. Union Producing Company, 243 La. 48, 141 So.2d 649 (1961). The provisions of contracts must be interpreted in relation to each other in order to give each the meaning that results from the entire agreement. Article 1955, Louisiana Revised Civil Code.
The clause immediately following the clause referred to above provides as follows:
Notwithstanding anything to the contrary herein contained, drilling operations on or production from a pooled unit or units established under the provisions of Paragraph 2 hereof or otherwise embracing land covered hereby and other land shall maintain this lease in force only as to land included in such unit or units. (Emphasis added)
Paragraph 2 of the lease agreement refers to voluntary pooling by the lessee. The "or otherwise" contained in this clause therefore must be construed as referring to a non-voluntary or force pooling situation. Paragraph 13 of the lease agreements specifically provides "The requirements hereof shall be subject to any State and/or Federal Law or order regulating operations on the land." Reading these provisions in pari materia the clause restricting pooling to production below 10,000 feet must be interpreted as applicable only to voluntary pooling.
*641 It is well settled in Louisiana law that the orders of the Commissioner of Conservation supersede the contracts of the parties, are incorporated in the contracts of lease and govern the respective rights and obligations of the parties, and production from a force pooled unit operates as a substitute for performance of drilling obligations contained in a mineral lease. In Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957), a case originating in this jurisdiction, the Supreme Court of Louisiana made the following observations at page 287 of the Southern Reporter:
Plaintiffs do not contest the right of the State to regulate and control, or to prohibit the production of minerals; and in the light of the foregoing principles they do not contest the right of the State to impair the obligations of contracts under valid police powers such as was exercised by the Legislature in Act 157 of 1940 (now LSA-R.S. 30:2-30:20). The preliminary cause urged by all the plaintiffs for the cancellation of their lease is that the unitization of a portion of the leased premises did not prevent or relieve the defendant Woods from the performance of the drilling obligation which he expressly assumed.
It is firmly established in our jurisprudence that statutory authority is granted to the Commissioner of Conservation to create drilling development units and to integrate various tracts of various owners contained in such units, that the orders of the Commissioner supersede, supplement, replace and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. LSA-R.S. 30:1 et seq. It necessarily follows that these orders become the law as between the parties in determining their respective rights and obligations.
Sec. 8(b) of Act 157 of 1940, as amended, LSA-R.S. 30:9(B), authorizes the commissioner to establish drilling units so as to prevent waste and to avoid the drilling of unnecessary wells. The unit contemplated means the maximum area that might be efficiently and economically drained by one well, the owner of such tracts to share rateably according to their ownership. Such units constitute a developed area as long as a well is located therein which is capable of producing oil or gas in paying quantities.
The rule is too well established in our jurisprudence to require citation that the drilling and production of oil from a unitized area constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.
As pointed out by us in Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734, and in Crichton v. Lee, 209 La. 561, 25 So.2d 229, the lessor in such cases received the same revenue as he would have received if the well had been located on his lands and the lessor of any particular tract can receive no more even if the well were drilled on the land covered by his lease. (Emphasis added) See also Caldwell v. Humble Oil & Refining Company, 155 So.2d 228 (La.App. 2nd Cir., 1963).
The result thus reached is equitable because the lessee is precluded from complying with his contractual obligations by the order of the Conservation Commissioner. In the instant case the Commissioner entered the following order:
The separately owned tracts, mineral leases and other property interests within the unit established herein are hereby pooled, consolidated, and integrated in accordance with Section 10, Title 30 of Louisiana Revised Statutes of 1950, with each tract sharing in unit production in the proportion that the surface area of such tract bears to the entire surface area of said unit. Also, all operations on and production from such unit shall be considered operations on and production from each of the separate tracts within said unit and under the terms of each of the mineral leases affecting said tracts. (Emphasis added)
*642 Accordingly, it is the opinion of this Court that the petitions of the plaintiffs state no cause of action in alleging that the leases terminated for failure of the lessee to actually drill and produce from the lease premises during the primary term.
III. TERMINATION OF LEASE FOR NON-PAYMENT OF ROYALTIES
Since the dispute between the parties to this litigation commenced on or after September 19, 1975, the Louisiana Mineral Code which became effective on January 1, 1975, is applicable. R.S. 31:137 provides as follows:
If a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he must give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease. (Emphasis added)
R.S. 31:138 provides in part that "The lessee shall have thirty days after receipt of the required notice in which to pay the royalties due or to respond by stating in writing a reasonable cause for non-payment."
R.S. 31:139 provides in part that "If the lessee pays the royalties due in response to the required notice, the remedy of dissolution shall be unavailable unless it be found that the original failure to pay was fraudulent." This statutory scheme evidences a legislative determination that a mineral lessor does not have a right of action to judicially complain of the failure of his lessee to make timely or proper payments of royalties until he gives written notice of such failure to his lessee and allows him thirty days after receipt of the required notice to either pay the royalties due or state a reasonable cause for non-payment. Agurs v. AMOCO Production Company, 465 F.Supp. 154 (W.D.La.1979).
In their original petitions, the plaintiffs sought cancellation of their leases for failure of the lessee to actually produce from the leased premises during the primary lease term. In Paragraph 10 of their petitions, in the alternative, plaintiffs allege that the leases "have terminated because of the failure to pay petitioners any portion of said production." Construing that language most favorably to the plaintiffs, this Court will interpret it to mean failure to pay royalties pursuant to Paragraph 6 of the lease agreement. The original petitions filed on May 21, 1979, failed to properly show rights of action in the plaintiffs because they did not allege facts showing compliance with R.S. 31:137 and 138.
On March 7, 1980, Second Amending and Supplemental petitions were filed in both suits alleging compliance with R.S. 31:137 by letters of June 20, 1978, June 18, 1979, and August 24, 1975, and by the filing of the instant law suits. On or about January 23, 1980, prior to the time that the Second Amending and Supplemental Petitions were filed, Gene McCutchin tendered royalty payments for the period from commencement of production through November 1979 to the plaintiffs. Counsel for the plaintiffs admitted in oral arguments before the Court that the plaintiffs have declined to negotiate the tendered royalty payment checks.
The letter by Bussie Rebstock received by Gene McCutchin on June 20, 1978, does not make a demand for royalty payments pursuant to R.S. 31:137 and 138. A fair interpretation of this letter indicates that Rebstock was reasserting the position that he took in his letter of October 5, 1975, wherein he claimed that the lease expired on September 19, 1975 for failure to obtain actual drilling and production on the leased premises.
The allegations of the Second Amending and Supplemental petitions referring to the letter of June 18, 1979 from Edward T. Diaz to John M. McCollum must refer to the letter filed in evidence dated January 18, 1979. This letter did not make reference to the Roger Rebstock lease. It stated that it was the author's opinion that the lease by Avilia St. Pierre Rebstock and Bussie Rebstock had expired. It further stated that any "pooling by the State would not inure to you, but to Mr. Rebstock." The letter *643 then requested the payment of 8/8's of productions after costs to Mr. and Mrs. Bussie Rebstock. This letter did not demand payment of one-sixth royalties pursuant to Paragraph 6 of the lease agreement. This letter did not give the defendants' thirty days in which to comply as required by R.S. 31:138. The letter is dated January 18, 1979, and advised if there was no lease cancellation and payment of 8/8's of production by February 15, 1979 (a period of only twenty-eight days) that suit would be filed. The letter of January 18, 1979 did not properly comply with the requirements of R.S. 31:137 and 138.
The letter of August 24, 1979, was sent more than ninety days after the original petitions were filed, and accordingly was not sent as a prerequisite to judicial demand. This letter made demand for 8/8's royalties due to the Rebstock's and not royalties as provided for in Paragraph 6 of the lease agreement. This letter was directed to Gene McCutchin and advised him that "unless we receive some explanation as to where the Rebstocks funds are being paid, we will be compelled to file suit against you, as operator for an accounting." Clearly this letter does not comply with R.S. 31:137 and 138.
The plaintiffs allege that the filing of these suits was a proper demand for payment of the oil and gas production in accordance with R.S. 31:137. A judicial demand is not a valid prerequisite under R.S. 31:137 to a judicial demand. R.S. 31:137 requires written notice as a prerequisite to judicial demand. R.S. 31:138 gives the lessee thirty days within which to respond to the written demand required by R.S. 31:137. The original petition demands cancellation and not payment of royalties. Clearly this allegation is untenable.
None of the letters were directed to Charles A. O'Niell, Jr., or Mrs. Alma Porter McCutchin, who was also a party to the assignment between Charles A. O'Niell, Jr., and Gene McCutchin.
The original petitions claimed that the leases terminated on September 19, 1975, for failure of the lessees to actually drill and produce minerals from the leased premises. The claim for termination for non-payment of royalties was not seriously made until the filing of the Second Amending and Supplemental Petitions in March, 1980. At that point in time, payments had been tendered by the checks were not negotiated by the plaintiffs.
The pleadings filed by the plaintiffs and the evidence introduced demonstrate that the plaintiffs have no right to proceed with this action because of their failure to properly comply with the requirements of R.S. 31:137 and 138.
IV. CONCLUSION
For all of the above reasons, judgment will be rendered in these matters sustaining the exceptions of no right of action and no cause of action and dismissing the petitions of the plaintiffs with prejudice at plaintiffs costs.
Judgment will be rendered accordingly,
Thibodaux, Parish of Lafourche, State of Louisiana, this 5th day of September, 1980.
 /s/ Walter I. Lanier. Jr.
 Judge Walter I. Lanier, Jr.
 17th Judicial District Court
 Parish of Lafourche, Div. "A"
ROGER REBSTOCK 17TH JUDICIAL DISTRICT COURT
VERSUS NO. 39911 PARISH OF LAFOURCHE
BIRTHRIGHT OIL & GAS COMPANY, ET AL STATE OF LOUISIANA
 DIVISION "A"

JUDGMENT
The above entitled and numbered cause came up for a hearing, pursuant to a previous regular fixing and the Court after reviewing the pleadings, the evidence, the law and the memoranda submitted by the parties, and considering the law and the evidence to be in favor of the defendants, *644 Birthright Oil & Gas Company, and Gene McCutchin and against the plaintiff, Roger Rebstock:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the defendants, Birthright Oil & Gas Company, et al., and against the plaintiff, Roger Rebstock, sustaining the peremptory exceptions of no right of action and no cause of action and dismissing the suit with prejudice at plaintiff's costs.
JUDGMENT RENDERED, READ AND SIGNED in Open Court at Thibodaux, Parish of Lafourche, State of Louisiana, on this 5th day of September, 1980.
 /s/ Walter I. Lanier. Jr.
 Judge Walter I. Lanier, Jr.
 17th Judicial District Court
 Parish of Lafourche, Div. "A"