SHORTESS, Judge.
This appeal stems from a concursus proceeding provoked by Amoco Production Corporation. As part of that action, J. Burton LeBlanc (LeBlanc) sought cancellation of a mineral sublease. In a lengthy judgment involving many parties, most not involved in this appeal, the trial court declared that the mineral sublease executed by LeBlanc as sublessor and Exxon Corporation (Exxon) as sublessee remained in full force and effect. LeBlanc has perfected this appeal.
On January 31,1979, LeBlanc and Exxon executed the sublease covering several parcels of land, including the 14 acres in question here. It provided for termination of the lease unless either (1) rental payments were made, or (2) operations for drilling were commenced on or before the anniversary dates of January 31, 1980, and January 31, 1981. Exxon timely paid rentals for the area in question before the January 31,1980, anniversary date. It paid no rentals covering the disputed area for the year beginning January 31, 1981, because it had begun drilling a well prior to that date within the unit (Unit “0”) containing the 14 acres. That well was a dry hole, and Exxon stopped drilling on March 27, 1981, and plugged and abandoned it on May 23, 1981. Effective January 26, 1982, the Commissioner of Conservation issued Order No. 1027-A-6, which removed the 14-acre parcel from Unit “0” and included it in Unit “K,” which contained a producing well.
LeBlanc contends that the trial court erred because it failed to properly interpret the sublease. He points particularly to numbered paragraphs three and six which appear on pages seven, eight, and nine of the sublease.[1] LeBlanc takes this position: paragraph three relieved Exxon of the obligation to pay rentals if it had commenced drilling operations on or before the anniversary date and if it pursued these operations diligently. Paragraph six defines commencement of operations and provides “that such operations must be continuous or with no cessation of more than ninety (90) days....” More than 90 days elapsed with no operations after the well in Unit “0” was abandoned. Therefore, the “operations” undertaken by Exxon were not sufficient to relieve it of the obligation to pay *573 rentals. Since no rentals were paid, Le-Blanc reasons, the sublease terminated.[2]
As we appreciate Exxon’s brief, it offers a two-part response. First, it contends that paragraph six does not establish a resolutory condition based on the “cessation” language; instead, operations that began prior to the anniversary date and continued until sometime after it excused the payment of rentals and maintain the lease through the next anniversary date. Second, it argues that the lease was maintained as to the 14 acres because at the end of the primary term (January 31, 1982), there was production on the unit that then included the 14-acre tract. In other words, the Commissioner of Conservation’s restructuring of the units in January, 1982, which had the effect of placing the disputed parcel in a producing unit, satisfied the terms for continuing the agreement.
To support its first contention, Exxon refers to Broadhead v. Pan American Petroleum Corp., 166 So.2d 329 (La.App. 3d Cir.), writ refused, 246 La. 873, 167 So.2d 679 (1964), and to what it deems the “general rule” as applied to this case; ie., operations beginning before January 31, 1981, and continuing past that date secure the sublease for another year, until January 31, 1982. In Broadhead, as in this case, the lessee was drilling a well on the anniversary date. But unlike the facts of the instant case, the lessee in Broadhead completed the well as a producer nine days following the anniversary date. The Broadhead court needed only to decide that those operations kept the lease in force for nine days until production was achieved. That court was not faced with deciding, nor did it decide, whether drilling which ended with a dry hole maintained a lease for another year despite a “no cessation” clause.
The Broadhead court concluded, “There was thus no necessity under the pleadings and the terms of the lease for the lessees to pay delay rentals.” Broadhead, 166 So.2d at 333. (Emphasis supplied.) The emphasized words point out most strongly the distinction between Broadhead and this case and also the weakness in Exxon’s application of the “general rule.” Whatever the general rule, the LeBlanc-Exxon agreement is governed by the provisions of the sublease. Paragraph three sets out the conditions under which Exxon is excused from paying rentals to preclude termination: (1) it must have commenced “operations for drilling” and (2) it must pursue those operations diligently. Paragraph six explains what is meant by “operations for drilling,” and part of that explanation is the requirement that such operations be continuous or without any cessation of over 90 days. When paragraph three is read in light of this requirement in paragraph six, it becomes clear that the sublease permits avoidance of rental payments only when operations beginning before the anniversary date are free from any cessation of more than 90 days. The drilling activities undertaken by Exxon on Unit “0” did not qualify as operations diligently pursued under the terms of the lease. In other words, the drilling which ended with a dry hole and over 90 days of inactivity cannot be properly denominated “operations” or “operations diligently” pursued as defined by the lease.
Nonetheless, Exxon argues that the requirements of paragraph six do not amount to an express resolutory condition; that paragraph “merely supplies a definition.” The logic of the lease is essentially this: the definition sets out a criterion for “operations.” Operations meeting that criterion are necessary to excuse rental payments. Exxon’s activities did not meet the criterion; thus rentals were due. Exxon did not pay rentals (or perform satisfactory operations). Therefore, the lease terminated. As this analysis indicates, the “no cessation” clause has the effect of a resoluto-ry condition.
The jurisprudence has recognized that “no cessation” clauses can state resolutory *574 conditions. In Talley v. Lawhon, 150 La. 25, 90 So. 427 (1922), the court annulled a lease which provided that lease payments were waived when the lessee engaged in operations, as long as there was no cessation of work of over 60 days: “[T]he lease had been suffered to lapse for lack of reasonable continuation of the work.” Talley, 90 So. at 428. In Woods v. Ratliff, 407 So.2d 1375 (La.App. 3d Cir.1981), plaintiffs sought cancellation of a lease after its primary term. Production had ceased, and the lease could be maintained only so long as the lessee either engaged in drilling or reworking operations with no cessation of more than 90 consecutive days or again achieved production. “[Pjlaintiffs [lessors] established that on May 2, 1979, the well was shut down and in excess of ninety consecutive days thereafter, defendants neither produced minerals nor drilled or reworked the well.” Woods, 407 So.2d at 1378. The court concluded that by its terms the lease terminated 90 days after May 2,1979.[3] The Reporter of the Mineral Code provides an accurate summary:
The jurisprudence also recognizes that there are other types of express resoluto-ry conditions which may occur, such as failure to meet a drilling obligation within the time stated or failure to pay delay rentals, the occurrence of which automatically dissolves the lease E.g., ... Talley v. Lawhon, 150 La. 25, 90 So. 427 (1922) (sixty day cessation of operations clause).
LSA-R.S. 31:133, comment.
Numbered paragraph two (appearing on page seven of the lease) provides for the payment of delay rentals on the second anniversary date (January 31, 1981). We note that it does not refer explicitly to termination as the penalty for failure to pay rentals if sufficient operations are not commenced and diligently pursued. It does, however, provide that such payment “shall cover the privilege of deferring the commencement of drilling operations.” It is an inescapable conclusion that under this paragraph the failure to make rental payments timely triggers (i.e., ends the “privilege of deferring”) the obligation to begin operations for drilling and to pursue such operations diligently, as specified and defined elsewhere in the lease. Failure to meet these obligations results in termination, as numbered paragraph one indicates, for the requirements in the “if” clause of paragraph three, as defined in paragraph six, have not been met.
This analysis of the clauses of the mineral lease in pari materia is not, as Exxon appears to suggest, an invitation to misconstruction of the agreement. Indeed, the rule of former LSA-C.C. art. 1955 (see current art. 2050), that “[ajll clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act,” was applied by the Supreme Court as early as 1870 to interpret a mineral lease. Escoubas v. Louisiana Petroleum and Coal Oil Co., 22 La.Ann 280 (La.1870). And we employed the same rule to construe the mineral lease in the rather more recent case of Rebstock v. Birthright Oil & Gas Co., 406 So.2d 636 (La.App. 1st Cir.), writ denied, 407 So.2d 742 (La.1981). We need not repeat here the analysis of the separate clauses; suffice it to say that, when the clauses are “interpreted the one by the other, giving to each the sense that results from the entire act,” it is evident that Exxon’s rights under the contract had come to an end.
Exxon cites the Williams and Meyers treatise Oil and Gas Law for the proposition that an operative delay rental clause bars implication of a covenant to reasonably develop the land. Williams and Meyers, 5 Oil and Gas Law § 8351. We accept this statement of the law; had Exxon made timely payment of delay rentals, it would have been relieved of the obligation to reasonably develop, as happened after the first anniversary date. But Exxon did not pay the rental due on the second anniversary date. It therefore was obligated, after January 31, 1981, to undertake operations *575 as required'not just by the legal implication but also by the contract. Exxon did not comply with those contractual standards relative to “operations for drilling.” In short, the treatise section cited by Exxon simply does not address itself to the facts of this case because the delay rental clause was not “operative” to relieve Exxon of the obligation to undertake operations.
Accordingly, we hold that the sublease terminated because of Exxon’s failure to comply with its terms.
Having ruled that the lease of the 14-acre tract terminated, we need only briefly discuss the second point raised by Exxon. It is true that due to the Commissioner of Conservation’s order effective January 26, 1982, the 14 acres were included in Unit “K,” in which there was then a producing well. However, this order does not revive the lease once it has terminated. Production from a unit can only continue (not breathe new life into) the lease as to the land newly included within that unit. The Commissioner’s order is simply a conservation measure and does not vest the right to produce minerals in one who has, by the terms of his sublease, lost that right. See generally, Southwest Gas Producing Co. v. Creslenn Oil Co., 181 So.2d 63, 67 (La.App. 2d Cir.1965), writ denied, 248 La. 797, 182 So.2d 74 (La.1966).
For the foregoing reasons, the judgment of the trial court which maintained the sublease between LeBlanc and Exxon is reversed only insofar as the 14-acre tract is concerned, and judgment is rendered in LeBlanc’s favor terminating said sublease as to said 14-acre tract. Costs are taxed to Exxon.
REVERSED AND RENDERED.
LOTTINGER, J., concurs.
APPENDIX
3) No rental payment shall be due or paid to Sublessor under Paragraphs 1) and 2) above, if on or before the respective due date of such payment, Exxon has commenced or caused to be commenced, operations on the subleased premises or land pooled therewith for the drilling of a well and pursues such operations diligently and in good faith in search of production. Provided however, that if on or before one (1) year from the effective date hereof, such operations have commenced for the drilling of a well and are or have been diligently and in good faith conducted in search of production, whether or not such operations result or resulted in production or a dry hole, on a unit or units containing a portion of the subleased premises, irrespective of whether such operations are or were conducted on the subleased premises or lands pooled therewith, Exxon shall pay or tender to Sublessor as rental, the sum of Five Hundred Dollars ($500.00) per acre as to that portion, if any, of the subleased, premises the surface of which is outside the boundaries established for any such unit or units; and on the second anniversary from the effective date hereof said rental sum shall be increased to the sum of One Thousand Dollars ($1,000.00) per acre as to that portion, if any, of the subleased premises, the surface of which is outside the boundaries established for any such unit or units. If no unit is established for a well by the Commissioner of Conservation of the State of - Louisiana, the drilling and/or producing unit, for purposes of this Sublease Agreement, shall be deemed to comprise one hundred and sixty (160) acres for oil and six hundred and forty (640) acres for gas (the well permit shall determine whether such well is an oil or gas well until actual discovery of oil or gas) in, as near as practical and in consideration of all relevant factors, the form of a square with the well in the center thereof; subsequent establishment or realignment of units by any governmental authority shall not require a readjustment or recomputation of any sums already paid by Exxon pursuant to the provisions of this or any other paragraph, nor shall any additional sums *576 be due or payable to Sublessor by reason thereof.
[[Image here]]
6) Wherever used in this Sublease, “operations for drilling”, “drilling operations”, “reworking operations”, “engaged in drilling or reworking operations”, and “operations” shall be deemed to have been timely commenced when work is begun, or materials are placed on the surface of the lands described in Exhibit “A”, attached hereto, or land pooled therewith (as the case may be) preparatory to the drilling or reworking of a well. It is provided, however, that such operations must be continuous or with no cessation of more than ninety (90) days whether on the same or different wells.

. These portions of the lease are reproduced in the appendix.

. LeBlanc also assigns as error the trial judge’s faitee to incorporate into his judgment certain stipulations regarding royalty payments. He offers but one sentence of argument to explain and support his position. We consider this assignment abandoned because not briefed. Uniform Rules — Courts of Appeal, Rule 2-12.4.

. We recognize that, unlike the clauses in the Woods and Talley leases, paragraph six does not itself explicitly state that termination will result from a cessation of over 90 days. However, as we discussed above, the lease as a whole indicates that failure to pay rentals or conduct operations as defined by paragraph six will result in termination of the lease.