MOORE, J.
LThe lessors, B.A. Kelly Land Co. and Augton Co., filed this suit in 2009 to declare a 1971 mineral lease automatically terminated due to the lessees’ failure to produce or perform operations for 11 months in 1988 and 1989. The district court sustained the lessees’ exceptions of prematurity and no cause of action based on the “judicial ascertainment” clause in the lease, and dismissed the suit without prejudice. The lessors now appeal. For the reasons expressed, we affirm in part, amend in part and remand.

Factual Background

In October 1971, Dorothy Richardson granted an oil, gas and mineral lease to PAR Oil (“the PAR lease”), covering a 40-acre tract in Elm Grove Field, Sec. 31, T17N, R11W, Bossier Parish. The lease was for a primary term of two years,[1] with a habendum clause[2] and shut-in clause.[3] Crucial to this case, the lease also contained a judicial ascertainment clause:
13. After production of oil, gas, sul-phur or other mineral has been secured from the land covered hereby or land pooled therewith, this lease shall not be subject to forfeiture or loss, either in whole or in part, for failure to conduct operations in compliance with this contract except after judicial ascertainment that Lessee has failed to conduct such operations Land has been given a reasonable opportunity after such judicial ascertainment to prevent such loss or forfeiture by complying with and discharging its obligations as to which Les *185 see has been judicially determined to be default. * * *
An operator, Mobley, acquired an interest in the PAR lease and, in 1974, drilled the Mims # 1 well on land unitized with the lease tract. According to documents filed in this case, Mims # 1 was completed in January 1975 and remains a producing well to date.
In the 1990s, Mrs. Richardson donated the lease tract to her son, who later conveyed the mineral rights to the plaintiffs, B.A. Kelly Land Co. and Augton Co. Through other conveyances, Questar Exploration, Atlanta Exploration and 16 other entities acquired leasehold interests in the lease; in 1996, Questar Exploration became the operator of the unitized Sec. 31, in which this tract sits. Questar Exploration is now known as QEP.
In November 2009, B.A. Kelly and Aug-ton filed this suit seeking a declaration that the PAR lease was automatically terminated because over two periods, November 1988-January 1989 and June-October 1989, no minerals were produced, and from November 1988 to October 1989 no operations of any kind were performed, on the lease tract or on lands pooled with it. The lessors named QEP, the current operator, and the 17 other leaseholders as defendants. They alleged that Mrs. Richardson was never advised of the cessation of production or operations, as required by La. R.S. 31:102, and there was no lack of market or unavailability of a pipeline outlet sufficient to trigger the shut-in clause; hence, the lease “terminated automatically by occurrence of a resolutoiy condition, specifically the cessation of production in paying quantities.” They demanded a declaration |sthat the PAR lease was terminated; costs, attorney fees and damages; removal of all facilities from the lease tract; and an accounting.
On December 21, 2009, attorney Mike Donald filed an answer on behalf of all defendants. The answer mostly denied all allegations; under the heading of “Affirmative and Other Defenses,” it asserted that the petition failed to state a claim on which relief may be granted because “Plaintiffs have not met all conditions precedent to seek cancellation of a mineral lease.” The answer also included a recon-ventional demand for reimbursement of all facilities and costs, in the event the PAR lease was terminated.
On January 13, 2010, attorney Joseph Shea, on behalf of Atlanta Exploration and 10 other defendants, filed a motion to strike Mr. Donald’s answer. These defendants (now referred to as “the Atlanta defendants”) attached affidavits swearing that they had retained Mr. Shea to represent them, but that Mr. Donald erroneously filed an answer naming them as his clients. They sought a rule to show cause and leave of court to file their own exceptions (including a dilatory exception of prematurity) and answer.
The plaintiffs did not object to letting the Atlanta defendants file a new answer, but strongly argued that they could not revive the dilatory exception of prematurity that Mr. Donald had waived by filing an answer. After a hearing on April 19, the district court granted the Atlanta defendants leave to file exceptions and an answer, but ruled that the others (now referred to as “the QEP defendants”) could not.
|4The Atlanta defendants filed their exceptions and answer, specifically a dilatory exception of prematurity, urging that the plaintiffs had not yet obtained a judicial ascertainment under ¶ 13 of the PAR lease that the lessee failed to conduct operations and was given a reasonable opportunity to prevent the forfeiture or loss. They also denied the plaintiffs’ allegations and as *186 serted a reconventional demand similar to the QEP defendants’.
Later, the QEP defendants filed an amended answer, reiterating the “affirmative defense” that the plaintiffs had not met the conditions precedent to seek cancellation of the lease. They also filed a motion for summary judgment (as did the Atlanta defendants and the plaintiffs). Filings in support of and opposition to these motions showed that Mrs. Richardson received no royalty checks for the 8 months in 1988 and 1989, and by affidavit she stated that she was never notified that the well was shut in; thus the plaintiffs felt they were entitled to judgment that the lessees ceased production, effecting the automatic termination of the lease.
All defendants conceded that Mrs. Richardson received no royalty checks for the months in question, but argued that the natural gas market collapsed in late 1988, leading their exclusive buyer, Arkla, to halt gas purchases; the operator at the time, Mobley, went bankrupt as a result; his bankruptcy estate eventually received a settlement from Arkla, of which a proportionate share ($471.01) was sent to Mrs. Richardson in November 1993, and she cashed the check. They argued that these facts showed they did not simply cease production, such as would automatically terminate the lease under La. R.S. 81:124 and provisions of the PAR lease.
|fiThe Atlanta defendants reasserted their dilatory exception of prematurity based on the lessors’ failure to get a judicial ascertainment. They also argued that any claim for unpaid royalties prescribed in three years under La. C.C. arts. 3494(5) and 3495.

Action of the District Court

At a hearing on motions on December 12, 2011, the Atlanta defendants argued their exception of prematurity and the QEP defendants argued that the plaintiffs’ failure to seek judicial ascertainment could be raised as a peremptory exception of no cause of action. The plaintiffs argued, in essence, that if the lease was automatically terminated, then the judicial ascertainment clause was null and void.
The court ruled from the bench that the matter was premature. It rendered judgment sustaining the Atlanta defendants’ exception of prematurity and dismissing all claims against them, and dismissing all claims against the QEP defendants as premature. The judgment declared both dismissals without prejudice, but barred the plaintiffs from amending their petition to assert a claim for judicial ascertainment.
The plaintiffs have appealed, raising three assignments of error.

Discussion: Representation of the Atlanta Defendants

By their first assignment of error, the plaintiffs urge the court erred in sustaining the exception of prematurity since all defendants waived any dilatory exceptions through the answer filed in December 2009. The dilatory exception must be pleaded “prior to or in the answer,” La. C.C.P. art. 928 A, or else it is waived. Barrie v. V.P. Exterminators Inc., 625 So.2d 1007 (La.1993). Mr. Donald’s answer, filed in December 2009 on behalf of all defendants, contained no dilatory exceptions; hence, these were waived. Moreover, the Atlanta defendants did not establish that Mr. Donald lacked the authority to represent them when he filed an answer. An attorney who appears to represent a party is presumed to have authority. Holloway v. City of Alexandria, 506 So.2d 234 (La.App. 3 Cir.1987).
The Atlanta defendants respond that the district court received and read affidavits whereby each entity swore that it did not retain Mr. Donald as its attorney, and this was sufficient to support the ruling.
*187 The relationship between an attorney and his client is purely contractual in nature and results only from a clear and express agreement between the parties. Weinstein v. Weinstein, 2010-1083 (La.App. 3 Cir. 4/13/11), 62 So.3d 878; Spicer v. Gambel, 00-1995 (La.App. 4 Cir. 6/20/01), 789 So.2d 741. Establishment of an attorney-client relationship is adequately proven when it is shown that the advice and assistance are sought and received in matters pertinent to the attorney’s profession or when the agreement of representation has been made under conditions acceptable to both parties. Weinstein v. Weinstein, supra, and citations therein. An attorney-client relationship cannot exist in the absence of any initial communication, either verbal, written or otherwise, between the attorney and the client. Spi-cer v. Gambel, supra, and citations therein. Courts have the inherent power to regulate the practice of law. Hodges v. Reasonover, 2012-0043 (La.7/2/12), 103 So.3d 1069; Stonetrust Comm’l Ins. Co. v. George, 46,560 (La.App. 2 Cir. 11/23/11), 81 So.3d 9.
|7Each of the Atlanta defendants filed an affidavit whereby its manager or president swore that he retained Mr. Shea, not Mr. Donald, as its counsel; he never saw or approved the answer drafted by Mr. Donald until after it was filed; he never consented to the waiver of any defenses by filing an answer; and he never subjectively believed that he was in an attorney-client relationship with Mr. Donald. There was no evidence to the contrary. On this record, the district court was entitled to find that Mr. Donald did not represent the Atlanta defendants. Spicer v. Gambel, supra. As part of its inherent authority to regulate the practice of law, the court did not abuse its discretion in granting the Atlanta defendants leave of court to file an answer and exceptions through their chosen attorney, Mr. Shea. This assignment of error lacks merit.

The QEP Defendants’ Exception of No Cause of Action

By their second assignment of error, the plaintiffs urge the court erred in sustaining the exception of prematurity as to the QEP defendants, who did not assert the dilatory exception. The plaintiffs reiterate that the QEP defendants waived this exception by filing an answer, and contend that a court cannot on its own motion enter an exception of no cause of action based on a theory that the claim is premature. Moreno v. Entergy Corp., 2010-2268 (La.2/18/11), 64 So.3d 761.
The Atlanta defendants respond that the court may indeed treat a party’s failure to comply with a contractual provision as grounds for no cause of action. Rebstock v. Birthright Oil & Gas Co., 406 So.2d 636 (La.App. 1 Cir.), writ denied, 407 So.2d 742 (1981); Rivers v. Sun Exploration & Prod. Co., 559 So.2d 963 (La.App. 2 Cir. 1990). The QEP defendants submit that they adequately asserted the plaintiffs’ failure to comply with the judicial ascertainment clause to support the judgment.
The purpose of the peremptory exception of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the petition. Credit v. Richland Parish School Bd., 2011-1003 (La.3/13/12), 85 So.3d 669; Veroline v. Priority One EMS, 2009-1040 (La.10/9/09), 18 So.3d 1273. No evidence may be introduced to support or controvert an exception of no cause of action. La. C.C.P. art. 931. By contrast, the dilatory exception of prematurity questions whether the cause of action has matured to the point where it is ripe for judicial determination. Williamson v. Hospital Serv. *188 Dist. No. 1, 2004-0451 (La.12/1/04), 888 So.2d 782; Roark v. Liberty Healthcare Systs. LLC, 44,913 (La.App. 2 Cir. 12/9/09), 26 So.3d 968, writ denied, 2010-0390 (La.4/23/10), 34 So.3d 265. The supreme court recently held that these are two separate lines of inquiry, and it is error for a court to conflate them. Moreno v. Entergy Corp., supra.
The primary objective of the rules of procedure is to secure to all parties the full measure of their substantive rights. Unwired Telecom v. Parish of Calcasieu, 2003-0732 (La.1/19/05), 903 So.2d 392, and citations therein. Procedural rules exist for the sake of substantive law and to implement substantive rights, not as an end in and of themselves. La. C.C.P. art. 5051; Unwired Telecom v. Parish of Calcasieu, supra; Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983). The aim of pleading is to |9show that the court is vested with subject matter jurisdiction in the case, to set forth the bounds to a controversy, and to allow the parties to explore the issues within the bounds of the controversy. Unwired Telecom v. Parish of Calcasieu, supra.
In Unwired Telecom, supra, the supreme court held that even though the defendant failed to allege the unconstitutionality of a statute in a formal pleading in the appellate court, as required by jurisprudence, its argument in brief met the primary objective of procedural rules by fully illumining the substantive legal question and focusing attention on the constitutional issue. Hence, the court would consider the issue.
The same reasoning applies to the instant case. The plaintiffs alleged the existence of a mineral lease and sought automatic termination thereof due to a breach of certain provisions of the lease. The QEP defendants’ answer showed that another provision of the lease required a judicial ascertainment before the lease could be subject to forfeiture or loss; later, they framed their position as an exception of no cause of action. Their position is somewhat inartfully stated and blurs the distinction between the dilatory exception of prematurity and the peremptory exception of no cause of action. Moreno v. Entergy Corp., supra. However, it is minimally sufficient to set forth the bounds of the controversy and focus the court’s attention on the trae issue — whether dissolution may be granted before a judicial ascertainment is obtained. Un-wired Telecom, supra.
This approach is not unprecedented in mineral lease litigation. In Rebstock v. Birthright Oil & Gas, supra, the plaintiff sued to declare | inmineral leases terminated because of the lessees’ failure to pay certain royalties as required by the leases. The lessees countered that the plaintiff failed to provide notice of nonpayment, as required by R.S. 31:137, 138. The court sustained an exception of no cause of action, in essence because of the plaintiffs failure to comply with the statute. The court did not mention the potential application of an exception of prematurity, but found the petition insufficient to state a cause of action.
Under the circumstances presented in this case, and the guidance of Unwired Telecom and Rebstock, we find the district court did not err in reading the substance rather than the caption of the QEP defendants’ affirmative defenses and in considering whether the plaintiffs needed to obtain a judicial ascertainment. We are mindful of the supreme court’s recent admonition in Moreno v. Entergy Corp., supra, against conflating the notions of prematurity and no cause, but note that in Moreno, the exception of no cause “had not been raised by any party[,]” leading the court to hold that “the court of appeal *189 erred in supplying it on its own motion.” Id. at 763. In the instant case, the QEP defendants did indeed raise the exception of no cause on the issue of judicial ascertainment. On this record, the district court did not err in considering the substance of the QEP defendants’ argument. This assignment lacks merit.

Application of Judicial Ascertainment Clause

By their third assignment of error, the plaintiffs urge the court erred on the merits in finding that ¶ 13’s “cure” provision applied to the automatic termination of the lease for failure to produce. For purposes of the dilatory | ¶1 exception, the court must accept the factual allegations of the petition as true. La. C.C.P. art. 930. The petition alleged that no production occurred between November 1988-January 1989 and June-October 1989. A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition. La. R.S. 31:133. The plaintiffs contend that cessation of production is a resolutory condition that automatically terminates the lease. Frankel v. Exxon Mobil Corp., 2004-1236 (La.App. 1 Cir. 8/10/05), 923 So.2d 55; Amoco Prod. Co. v. Carruth, 512 So.2d 571 (La.App. 1 Cir.1987), writ denied, 516 So.2d 366 (1988); Trinidad Petroleum Corp. v. Pioneer Natural Gas Co., 416 So.2d 290 (La.App. 3 Cir.), writ denied, 422 So.2d 154 (1982). Further, under La. R.S. 31:124, when a mineral lease expires for lack of production under the habendum clause, it terminates automatically without any need for putting in default.[4] The judicial ascertainment clause is a “notice and cure” provision that does not apply when the lease terminates automatically for cessation of production. Taylor v. Kimbell, 219 La. 731, 54 So.2d 1 (1951); Sittig v. Dalton, 195 La. 765, 197 So. 423 (1940); Logan v. Blaxton, 71 So.2d 675 (La.App. 2 Cir.), writ denied (not reported, 1954). In essence, the automatic termination erases the judicial ascertainment clause. Smith v. Sun Oil Co., 172 La. 544, 135 So. 15 (1931). The plaintiffs conclude that “a long line of Louisiana cases,” cited in Williams & Meyers, Oil & Gas Law, 4 ed. § 682.2 (Lexis-Nexis, ©2011), holds notice and cure clauses inapplicable to the habendum clause in a mineral lease.
They further argue that construing ¶ 13 to forestall automatic termination is contrary to public policy limiting the term of leases without operation, La. R.S. 31:115,[5] *190 and other states have rejected judicial ascertainment clauses as contrary to public policy. They contend that a similar clause was found inapplicable in Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956), where the court rejected the lessee’s reliance on it as “anomalous, if not ridiculous.” Finally, a lease that terminates for failure to produce cannot be “revived” by later production. Amoco Prod. Co. v. Carruth, supra; Mobil Oil Exploration & Prod. Southeast v. Latham Exploration Co., 44,-996 (La.App. 2 Cir. 2/3/10), 31 So.3d 1149. They conclude the judgment should be reversed and the case remanded for further proceedings.
The Atlanta defendants respond that judicial ascertainment is the law between the parties, who may agree that automatic termination cannot occur without first getting a judicial ascertainment. Smith v. Sun Oil Co., 165 La. 907, 116 So. 379 (1928). Although Melancon v. Texas Co., supra, resulted 11sin cancellation of the lease, the supreme court recognized the validity of the clause. They argue there is no public policy in Louisiana against judicial ascertainment clauses, and foreign jurisprudence is not persuasive. Moreover, the plaintiffs cannot assume the lease is terminated simply to circumvent the clause; a court must determine whether the lessee breached the lease by failing to produce. McDowell v. PG&E Resources Co., 26,321 (La.App. 2 Cir. 6/23/95), 658 So.2d 779, writ denied, 95-1847 (La.11/3/95), 661 So.2d 1382. The Atlanta defendants submit that a judicial ascertainment is not only contractually mandated but advisable on this complex record, and the judgment should be affirmed.
The QEP defendants argue that Melan-con v. Texas Co., supra, recognizes the judicial ascertainment clause as an accepted contractual mechanism to avoid lease termination when a bona fide dispute exists, and that the clauses in the early Smith v. Sun Oil Co. cases were critically different from ¶ 13, applying only if production in paying quantities was established. They suggest that the result in Melancon was correct because there was no bona fide dispute; here, however, there is a dispute — whether the events .of 1988-'90 were a “cessation of production,” as claimed by the plaintiffs, or a “pipeline curtailment,” as claimed by the lessees— and hence the clause applies. Finally, judicial ascertainment is not against public policy, as “nothing in Louisiana law prevents long-term leasing following production, as in the present case.”
In the absence of a violation of law or public policy, the mineral lease constitutes the law between the parties and regulates their respective rights 114and obligations. La. R.S. 31:3; Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99), 737 So.2d 1257, 143 Oil & Gas Rep. 32; Adams v. JPD Energy Inc., 45,420 (La.App. 2 Cir. 8/11/10), 46 So.3d 751, writ denied, 2010-2052 (La.11/12/10), 49 So.3d 892. Mineral leases are construed as leases generally; the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases. Caskey v. Kelly Oil Co., supra. When the words of a mineral lease are clear and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046; Caskey v. Kelly Oil Co., supra. Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050; Franks Petroleum Inc. v. Mayo, 438 So.2d 696 (La.App. 2 Cir.), writ denied, 443 So.2d 595 (1983).
The PAR lease plainly includes ¶ 13: once production has been secured, the lease “shall not be subject to forfeiture *191 or loss” for failure to conduct operations “except after judicial ascertainment that Lessee has failed to conduct such operations” and been given an opportunity to prevent such forfeiture or loss. This provision is the law between the parties; it will be enforced unless modified or negated by other provisions of the lease or contrary to law or public policy.
A mineral lease terminates upon the occurrence of an express resolu-tory condition. La. R.S. 31:138. When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. La. R.S. 31:124. Even though production continues beyond the |1sprimary term, the term of the lease may expire and the contract be automatically dissolved if production is not in paying quantities. Id., editor’s notes; Noel Estate Inc. v. Murray, 223 La. 387, 65 So.2d 886 (1953). Many cases hold that leases, which were extended by production under the habendum clause, are automatically cancelled for the lessee’s failure to produce in paying quantities. See, e.g., Smith v. Sun Oil Co., 172 La. 655, 135 So. 15 (1931); Pace Lake Gas Co. v. United Carbon Co., 177 La. 529, 148 So. 699 (1933); Landry v. Flaitz, 245 La. 223, 157 So.2d 892 (1963).
To ameliorate the harsh consequence of termination, lessees introduced the shut-in clause. Patrick S. Ottinger, “Neither Fish Nor Fowl: The Louisiana Law of Shut-In Gas Wells,” 69 La. L.Rev. 43 (2008). This contractual innovation specifies circumstances in which the mineral lease might be maintained, in the absence of some other basis of maintenance, if a well is drilled and is capable of producing but is not in fact producing for a reason envisioned by the lease clause. Id. at 50. In our view, the provision for judicial ascertainment is another contractual innovation to ameliorate or forestall the harsh consequence of automatic termination.
In Melancon v. Texas Co., supra, the lease included a judicial ascertainment clause substantially similar to ¶ 13.[6] During the primary term, Texaco paid delay rentals until it drilled a productive gas well on land |1fiunitized with the lease tract; about a month later, however, Texaco shut in the well and tendered minimal shut-in payments to the lessor. The lessor met and exchanged letters with Texaco for the next 13 months; it transpired that Texaco was intentionally withholding rentals in an effort to coerce the lessor to agree to increasing the size of the production unit. The lessor finally sued to cancel the lease; Texaco raised, inter alia, the defense of the judicial ascertainment clause. The district court granted cancellation, ruling that the clause “relates to the judicial ascertainment of facts, conditions or circumstances that are the subjects of a bona fide dispute and as to which there is a real disagreement in good faith[.]” The supreme court affirmed:
We think the trial judge correctly ruled that the provisions concerning judicial ascertainment apply to a bona fide dispute as to which there is a real disagreement in good faith between the parties * * *. To hold as contended by counsel for defendant on this point would lead to an anomalous, if not ridiculous, situation, for the lessor would be at the mercy of the lessee; the latter might employ *192 whatever tactics he saw fit to obtain concessions or alterations in connection with the lease, knowing it would never be declared cancelled without his first being given the opportunity to comply after judicial proceedings. Id. at 624, 89 So.2d at 146.
Critically, the supreme court upheld the validity of the judicial ascertainment clause, but refused to enforce it on the showing of the lessee’s intentional conduct, the lack of a bona fide dispute, and the lessor’s multiple requests to resume production. The high court’s approval of the clause obviously supersedes earlier cases holding that “notice and cure” clauses — notably, those not calling for judicial ascertainment — were null when a lease automatically terminated for cessation of production. Taylor v. Kimbell, supra; Sittig v. Dalton, supra; Logan v. Blaxton, supra; Producers Oil & Gas Co. v. Continental Sec. Corp., 188 La. 564, 177 So. 668 (1987).
In the instant case, the parties agree that the lessee failed to produce over eight months, and failed to perform any operations over 12 months, in 1988 and 1989; however, the defendants raise the bona fide claim that this was a result of market conditions, Arkla’s breach of contract with the lessee, and whether these facts constituted a “force majeure or the lack * * * of a market at the well or wells” such as would maintain the lease under the shut-in clause. Under these facts, the defendants are entitled to judicial ascertainment under ¶ 13 of the PAR lease before any judgment declaring the lease cancelled.[7]
Finally, the plaintiffs argue that even if the judicial ascertainment clause is not modified or negated by other provisions of the lease, it cannot be enforced because it is contrary to law or public policy. The Mineral Code states that a lease “shall not be continued for a period of more than ten years without drilling or mining operations or production.” La. R.S. 31:115 A. The payment of shut-in royalties preserves the valid extension of the lease against forfeiture. Lelong v. Richardson, 126 So.2d 819 (La.App. 2 Cir. 1961). Given the bona fide dispute over whether the lessee’s conduct in 1988 and 1989 satisfied the conditions of the haben-dum clause and shut-in clause for maintaining the lease, we will not declare that the judicial | ^ascertainment clause violates R.S. 31:115. We are also unpersuaded by the citation to jurisprudence of other states. The stated rationale in cases like Wellman v. Energy Resources Inc., 210 W.Va. 200, 557 S.E.2d 254 (2001), is the “public policy against repeated litigation over the same issues.” The PAR lease has not been the subject of repeated litigation; we see no violation of public policy.
This assignment of error lacks merit.

Leave of Court to Amend

In their prayer for relief, the plaintiffs ask this court to remand the case for further proceedings. Similarly, the amici curiae urge the court to focus not on the merits but on the procedure of the case: whether the claim is ripe for determination. LaCoste v. Pendleton Methodist Hosp., 2007-0008 (La.9/5/07), 966 So.2d *193 519. They urge that all defendants asserted facts sufficient to place compliance with ¶ 13 at issue, and hence the court is obligated to make a judicial ascertainment.
At oral argument, counsel for the QEP defendants suggested that the court could prohibit the plaintiffs from amending their petition because the remedy of judicial ascertainment was “inconsistent” with the original claim for termination of the lease.
The district court sustained a dilatory exception of prematurity and a peremptory exception of no cause of action. When the grounds of the objections pleaded in the dilatory exception may be removed by amendment of the petition or other action, “the judgment sustaining the exception shall order plaintiff to remove them within the delay allowed by the court[.]” La. 1 lflC.C.P. art. 933 B. Leave to amend is also the rule when the grounds of a peremptory exception may be cured. La. C.C.P. art. 934. The petition and exceptions have clearly placed at issue the need for a judicial ascertainment in accord with ¶ 13 of the PAR lease.
We do not see the original claim for termination of the PAR lease as “inconsistent” with a claim for judicial ascertainment under ¶ 13; they appear to be two steps in the same process. Nevertheless, a petition may set forth two or more causes of action in the alternative, “even though the legal or factual bases thereof may be inconsistent or mutually exclusive.” La. C.C.P. art. 892; Alexis v. Metropolitan Life Ins. Co., 604 So.2d 581 (La.1992). In view of the liberal rule for amendment under Arts. 933 and 934, this court will amend the judgment to give the plaintiffs 30 days from the date of finality of this judgment to amend their petition to add a claim for judicial ascertainment. The case will be remanded for further proceedings.

Conclusion

For the reasons expressed, the judgment is affirmed insofar as it sustained the exceptions of prematurity and no cause of action. It is amended, however, to grant the plaintiffs 30 days from the date of finality of this judgment to amend their petition to add a claim for judicial ascertainment. The case is remanded for further proceedings.
All costs are to be assessed at the conclusion of the case.
AFFIRMED IN PART, AMENDED IN PART AND REMANDED.
APPLICATION FOR REHEARING
Before DREW, LOLLEY, MOORE, PITMAN and SEXTON (Pro Tempore), JJ.
Rehearing denied.

. "2. Subject to the other provisions herein contained, this lease shall be for a period of two years from this date (called "primary term”) and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner provided herein.”

. "7. This lease will continue in full force and effect within or beyond the primary term as long as any mineral is produced from said land hereunder or from land pooled therewith. * * * ”

. “§ 124. Production in paying quantities required; definition
"When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.
"As to all other minerals, it is sufficient if a reasonably prudent operator would continue production considering the particular circumstances in the light of the nature and customs of the industry involved. In appropriate cases, such as the mining of lignite, a court may consider the total amount of production allocable to the mining plan or project of which a particular lease is a part, rather than merely the amount of production from that lease.”

. "§115. Requirement of term; limitation of continuation without drilling or mining operations
"A. The interest of a mineral lessee is not subject to the prescription of nonuse, but the lease must have a term. Except as provided in this Article, a lease shall not be continued for a period of more than ten years without drilling or mining operations or production. Except as provided in this Article, if a mineral lease permits continuance for a period greater than ten years without drilling or mining operations or production, the period is reduced to ten years. * * * ”

. The lease in Melancon provided: "After production of oil, gas, sulphur or other mineral has been secured from the land covered hereby, this lease shall not be subject to forfeiture or loss, either in whole or in part, except after judicial ascertainment that the Lessee has failed to perform and discharge its obligations hereunder and has been given a reasonable opportunity thereafter to prevent such loss or forfeiture by complying with and discharging its obligations as to which Lessee has been judicially determined to be in default.”

. This court observes that with different lease provisions, a lessee's failure to pay royalties may override a "notice and cure” clause and result in automatic termination. Such was the result in Stream Family Ltd. Partnership v. Marathon Oil Co., 2009-561 (La.App. 3 Cir. 12/23/09), 27 So.3d 354, 172 Oil & Gas Rep. 489, writ denied, 2010-0196 (La.4/16/10), 31 So.3d 1064, where the lease stated: "Untimely or improper payment for royalties shall constitute an express resolutory condition of this lease with respect to LESSEE’S rights. * * * In the instance of willfully or persistently late or improper payments, LESSOR need not give such notice and the lease shall resolve immediately.”